1998 OK 25

In the Matter of the Application of the **OKLAHOMA CAPITOL IMPROVE-MENT AUTHORITY** for Approval of Not Exceeding $300 Million Oklahoma Capitol Improvement Authority State Highway Capital Improvement Revenue Bonds, Series 1997, for the Construction, Improvement, Maintenance and Repair of All or Part of Certain Roads, Highways and Bridges by the Oklahoma Department of Transportation.

No. 90101.

Supreme Court of Oklahoma.

March 20, 1998.

Rehearings Denied April 30, 1998.

W.A. Drew Edmondson, Attorney General, Douglas F. Price, Assistance Attorney General, Gary M. Bush, Oklahoma City, Thomas G. Hilborn, Jr., Tulsa, for Applicant Oklahoma Capitol Improvement Authority.

Edwin Kessler, Norman, Pro se opponent.

Dave Herbert, Oklahoma State Senator, Oklahoma City, Pro se opponent.

Russell Fister, Oklahoma City, for opponents Jerry R. Fent and Margaret B. Fent.

¶ 1   KAUGER, Chief Justice:

¶ 2   The dispositive issue presented is whether highway improvement bonds authorized by 73 O.S. Supp.1997 § 168.6[1] create a prohibited debt within the meaning of the Okla. Const. art. 10, §§ 23,[2] 24[3] and 25.[4] We find that the highway improvement bonds issued pursuant to 73 O.S. Supp.1997 § 168.6 are constitutional. Because the statute in question does not bind future Legislatures to make the anticipated appropriations, the highway improvement bonds do not create "debts" within the meaning of the Oklahoma Constitution. The full faith and credit of the state is not pledged, because there is only the prospect, not the promise, of future annual appropriations. This finding is supported by: 1) the statutory scheme requiring taxes and user fees and some Rainy Day Funds to be apportioned to the State Transportation Fund which was established specifically for the construction, repair and maintenance of the state highways; 2) the self-liquidating annual amortization of the proposed bonds; 3) Oklahoma jurisprudence upholding multi-year financing plans whether the plans are "self-liquidating" or "profit producing"; 4) Oklahoma's statutory and case law which clearly recognizes a distinction

---

1. Title 73 O.S. Supp.1997 § 168.6, see note 36, infra.

2. The Okla. Const. art. 10, § 23 provides in pertinent part:
   "The state shall never create or authorize the creation of any debt or obligation, or fund or pay any deficit, against the state, or any department, institution or agency thereof, regardless of the form, or the source of money from which it is to be paid, except as may be provided in this section and in Sections 24 and 25 of Article X of the Constitution of the State of Oklahoma...."

3. The Okla. Const. art. 10, § 24 provides in pertinent part:
   "In addition to the above limited power to contract debts, the State may contract debts to repel invasion, suppress insurrection or to defend the State in war ..."

4. The Okla. Const. art. 10, § 25 provides in pertinent part:
   "Except the debts specified in sections twenty-three and twenty-four of this article, no debts shall be hereafter contracted by or on behalf of this State, unless such debt shall be authorized by law for some work or object, to be distinctly specified therein; and such law shall impose and provide for the collection of a direct annual tax to pay, and sufficient to pay, the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty-five years from the time of the contracting thereof. No such law shall take effect until it shall, at a general election, have been submitted to the people and have received a majority of all the votes cast for and against it at such election...."

between "moral" and "legal" obligations; and 5) the overwhelming majority of decisions in sister states.

## FACTS

¶ 3 After a consideration of the proposal to improve Oklahoma's highway infrastructure, both Houses of the Legislature passed, with only one dissenting vote,[5] 73 O.S. Supp. 1997 § 168.6. The statute authorizes the Oklahoma Capitol Improvement Authority (Capitol Improvement Authority) to issue bonds (highway bonds) sufficient to generate $300,000,000.00 in proceeds to fund the construction and improvement of the state's highway system. The funding derives from pre-paid user fees and direct taxes and certain Rainy Day Funds dedicated specifically to the State Transportation Fund.[6]

¶ 4 On September 23, 1997, the Capitol Improvement Authority filed an application for approval of the highway bonds. Under 73 O.S.1991 § 160,[7] this Court has exclusive original jurisdiction to determine the validity of bond issues proposed by the Capitol Improvement Authority. Protests were filed in response to the application and the briefing cycle was completed on November 14, 1997. Oral argument was held before the Court *en banc* on December 2, 1997.

---

**5.** We note that art. 5, § 33 of the Okla. Const. referring to revenue bills originating in the House of Representatives, is inapplicable. Nevertheless, were it to apply here, the vote in the Legislature would remove it from the requirement that it be submitted to a vote of the public. Subsection D of art. 5, § 33 provides in pertinent part:

"Any revenue bill originating in the House of Representatives may become law without being submitted to a vote of the state if such bill receives the approval of three-fourths (3/4) of the membership of the House of Representatives and three-fourths (3/4) of the membership of the Senate and is submitted to the Governor for appropriate action ..."

**6.** See discussion and accompanying footnotes, pp. 762–763, infra.

**7.** Title 73 O.S.1991 § 160 provides in pertinent part:

"The Authority is authorized, in its discretion, to file an application with the Supreme Court

## I.

¶ 5 AS A MATTER OF FUNDAMENTAL LAW, THE FISCAL POLICY OF THIS STATE IS DETERMINED BY THE LEGISLATIVE DEPARTMENT OF GOVERNMENT. UNLESS A STATUTE IS FRAUGHT WITH CONSTITUTIONAL INFIRMITIES BEYOND A REASONABLE DOUBT, THE COURT IS BOUND TO ACCEPT AN INTERPRETATION WHICH AVOIDS DECLARING THE STATUTE UNCONSTITUTIONAL.

¶ 6 The authority of the Legislature indubitably extends to all rightful subjects of legislation pursuant to the Okla. Const. art. 5, § 36.[8] The framers of the Constitution, however, gave even more explicit recognition of the Legislature's authority with respect to roads and transportation. Pursuant to the Okla. Const., art. 16, § 1, the Legislature, not the voters, is given the express power to provide for building and maintaining public roads. This provision states:

"The Legislature is directed to establish a Department of Highways, and shall have the power to create improvement districts and provide for building and maintaining public roads, and may provide for the utilization of convict and punitive labor thereon."

¶ 7 The Okla. Const. art. 21, § 1[9] authorizes the Legislature to establish and

of Oklahoma for the approval of any bonds to be issued hereunder, and exclusive original jurisdiction is hereby conferred upon the Supreme Court to hear and determine each such application...."

**8.** The Okla. Const. art. 5, § 36 provides:

"The authority of the Legislature shall extend to all rightful subjects of legislation, and any specific grant of authority in this Constitution, upon any subject whatsoever, shall not work a restriction, limitation, or exclusion of such authority upon the same or any other subject or subjects whatsoever."

**9.** The Okla. Const. art. 21, § 1 provides:

"Educational, reformatory, and penal institutions and those for the benefit of the insane, blind, deaf, and mute, and such other institutions as the public good may require, shall be established and supported by the State in such manner as may be prescribed by law."

to provide support by the State for such other institutions as the public good may require as may be "prescribed by law." The term "prescribed by law" denotes legislative enactments—statutes promulgated by the governing legislative body.[10] Just as the Legislature prescribed review of the trust agreement by this Court[11] in *Matter of the Petition of University Hospitals Auth.*, 1997 OK 162, 953 P.2d 314, the Legislature, by law, has established the Capitol Improvement Authority. It has given the Capitol Improvement Authority the power to sell bonds paid by annual appropriations—provided by the Oklahoma Legislature to the Oklahoma Department of Transportation.[12]

■■■ ¶ 8 The protestants must carry a very heavy burden indeed, if the bonds are to be invalidated because every presumption must be indulged in favor of the constitutionality of a statute. The protestants have failed to do so. If there are two possible interpretations—one of which would hold the statute unconstitutional, the construction must be applied which renders it constitutional.[13] Unless a statute is shown to be fraught with constitutional infirmities beyond a reasonable doubt,[14] this Court is "bound to accept an interpretation that avoids constitutional doubt as to the validity of the provision."[15]

■■■ ¶ 9 Except where it encounters a specific constitutional prohibition, the Legislature has the right and the responsibility to declare the fiscal policy of Oklahoma. This Court has no authority to consider the desirability, wisdom, or practicability of fiscal legislation.[16] It is not this Court's prerogative to question the sagacity of the expressed policy. Whether an act is wise or unwise, whether it is based on sound economic theory or whether it is the best means to achieve the desired result are matters for legislative determination. This Court, may not, based on its perception of how the State should conduct its business dealings, direct legislative decision making.[17] In construing constitutional debt-limitation provisions, it is the judiciary's duty to guard against indebtedness, not against modern methods of financing.[18] It is not unconstitutional to accomplish a desired result, lawful in itself, by innovative, legal measures.[19] Because these bonds are self-liquidating and because they can be marketed without creating a debt or obligating, in a legal sense, either the state or future legislatures, art. 10, §§ 23,[20] 24[21] and 25[22] are simply inapplicable.[23]

---

**10.** *State ex rel. Strandberg v. State Bd. of Land Comm'rs*, 131 Mont. 65, 307 P.2d 234, 236 (1957); *Howard v. Cook*, 59 Idaho 391, 83 P.2d 208, 210 (1938); *Winters v. Hughes*, 3 Utah 443, 24 P. 759, 761 (1861).

**11.** Title 63 O.S. Supp.1997 § 3225.

**12.** Title 73 O.S. Supp.1997 § 168.6, see note 36, infra.

**13.** *Gilbert Central Corp. v. State*, 1986 OK 6, 716 P.2d 654, 658.

**14.** *Tate v. Browning Ferris, Inc.*, 1992 OK 72, 833 P.2d 1218, 1229.

**15.** *Gilbert Central Corp. v. State*, see note 13 at 658, supra.

**16.** *In re Initiative Petition No. 347*, 1991 OK 55, 813 P.2d 1019, 1031; *State ex rel. York v. Turpen*, 1984 OK 26, 681 P.2d 763.

**17.** *In re Initiative Petition No. 347*, see note 16, supra; *Palmer Oil Corp. v. Phillips Petroleum Co.*, 1950 OK ——, 204 Okla. 543, 231 P.2d 997, *appeal dismissed*, 343 U.S. 390, 72 S.Ct. 842, 96 L.Ed. 1022.

**18.** *Dieck v. Unified School Dist. of Antigo*, see note 54 at 618, infra.

**19.** *State v. Giessel*, see note 54 at 590, infra; *Tranter v. Allegheny County Auth.*, 316 Pa. 65, 173 A. 289, 297 (1934).

**20.** The Okla. Const. art. 10, § 23, see note 2, supra.

**21.** The Okla. Const. art 10, § 24, see note 3, supra.

**22.** The Okla. Const. art 10, § 25, see note 4, supra.

**23.** Because they are inapplicable to the situation presented here, construction of the debt limitation provisions of the Okla. Const. art. 10, §§ 23, 24 and 25, see notes 2, 3, and 4, supra, is unnecessary. *Smith v. State Bd. of Equalization*, 1981 OK 57, 630 P.2d 1264, 1267.

## II.

¶ 10 **THE BONDS ARE SELF–LIQUIDATING BECAUSE A PRE–PAID DIRECT, DEDICATED TAX ON MOTOR FUELS, SPECIAL FUELS, DIESEL FUEL, GASOLINE, AIRCRAFT FUEL, AND VEHICLE LICENSES IS SPECIFICALLY EARMARKED BY 73 O.S. SUPP.1997 § 168.6 TO RETIRE THE BONDS ON AN ANNUAL BASIS.**

¶ 11 The Legislature has determined that the highway infrastructure in Oklahoma is vital to the health, safety, and welfare of the traveling public and to the economic development of the state. The funding for the improvements to the transportation system made through the issuance of bonds pursuant to 73 O.S. Supp.1997 § 168.6 come from pre-paid user fees and direct taxes dedicated specifically to the State Transportation Fund and earmarked for the payment of highway bonds on an annual basis. Those taxes derive from direct taxes on motor fuels,[24] special fuels,[25] diesel fuel,[26] gasoline,[27] aircraft fuel,[28] and from vehicle license and registration fees,[29] all of which are assessed annually. The State Transportation Fund also receives a portion of the assessments levied under an environmentally-based indemnity fund.[30] Additionally, there is a newly authorized revenue stream dedicated to the funding of highway improvements—the Constitutional Reserve Fund (Rainy Day Fund). Ch. 380, § 1, 1997 Okla. Sess. Laws, provides for an appropriation of "Fifty Million Dollars ($50,000,000.00) or so much thereof as may be necessary to perform the duties set forth in Enrolled House Bill No. 1629." [Title 73 O.S. Supp. 1997 § 168.6 is § 7 of H.B. 1629.] The "duties" referred to in Ch. 380, § 1 are highway improvements. The bonds are, in the most elemental sense, "self-liquidating."

¶ 12 This combination of taxes and fees creates a revenue stream which is directly related to the construction and maintenance of highways in the self-evident sense that the creation, maintenance—indeed the very existence—of the State's highway system is the prerequisite for the generation of the revenue stream. The self-liquidating features of the present proposal compares most favorably with past propositions approved by this Court.

¶ 13 Most notably, one's attention is drawn to *Application of Oklahoma Capitol Improvement Auth.,* 1966 OK 6, 410 P.2d 46, and *Application of Oklahoma Capitol Improvement Auth.,* 1960 OK 2097, 355 P.2d 1028, 1031. There, the Court characterized bonds for state office buildings as self-liquidating because the Legislature appropriated to the tenant state agencies monies sufficient to pay the rent which would amortize the bonds. Although no revenues derived from sources outside state appropriations were involved, this Court found that the bonds for state office buildings were self-liquidating. In both cases, "self-liquidating" entailed putting enough state dollars in one pocket to support the rental payments which had to be made from the other pocket. Contrasted with this standard of "revenue generating", this proposal is far superior. Here, pre-paid direct dedicated taxes are earmarked on an annual basis to pay the bonds. Money goes directly into the state pocketbook from reliable, predictable user fees from "outside" sources rather than from one state entity to the other.

¶ 14 In addition to the cases in which this Court has approved bond issues to build state buildings to be retired by state appropriations to state agencies, the facts here closely resemble the construction of turnpikes. In *Application of Oklahoma Turnpike Auth.,* 1950 OK ——, 203 Okla. 335, 221 P.2d 795, 807, bonds were issued to build a toll road. The bonds were to be retired

---

**24.** Title 68 O.S. Supp.1996 § 500.1, *et seq.*

**25.** Title 68 O.S. Supp.1993 § 701, *et seq.* See specifically, 68 O.S. Supp.1997 §§ 704, 707.3, and 723.

**26.** Title 68 O.S. Supp.1997 § 500.7.

**27.** Title 68 O.S. Supp.1997 § 500.6.

**28.** Title 68 O.S. Supp.1997 § 500.6.

**29.** Title 47 O.S. Supp.1997 § 1104.

**30.** Title 17 O.S. Supp.1997 § 354.

solely from user fees—the tolls paid by travelers using the turnpike. That is akin to the situation presented here. The bonds will be retired by pre-paid direct taxes on the ultimate consumers who purchase petroleum products through funds earmarked for improvement of Oklahoma's roads.

¶ 15 The financing plan presented here has been historically the standard practice, not only in this state, but in other jurisdictions as well. In a case presenting almost identical facts to those arising here, the New York Court of Appeals upheld a transportation funding law, finding that it simply did not create a state debt prohibited by its constitution. In *Schulz v. State*, 84 N.Y.2d 231, 616 N.Y.S.2d 343, 639 N.E.2d 1140 (N.Y. 1994), the New York court was asked to determine whether a statute authorizing a multibillion dollar bond issue for state and local transportation improvements created a debt within the meaning of constitutional provisions similar to the Okla. Const. art. 10, §§ 23, 24 and 25.[31] The project was to be funded by the issuance of bonds with the improvement authority receiving revenue— subject to annual appropriations—from taxes and fees. Essentially, the appropriations were to be derived from user fees—vehicle registration fees, the motor fuel tax, the petroleum and aviation fuel business tax, and miscellaneous highway use taxes.

¶ 16 The bonds in *Schulz* were to be secured by service contracts and sale- and leaseback agreements between the improvement authority and the state. Clear statutory language provided that the bonds issued were not to constitute debts of the State of New York. The *Schulz* protestants also claimed that the "moral obligation" bonds would, as a practical matter, coerce future legislatures into making appropriations to avoid damage to the state's credit rating. The *Schulz* court acknowledged that according to its prior precedents multi-year "moral obligation" bonds did not constitute a legally enforceable debt, that future legislatures were not (and could not be) obligated to make the appropriations and required the approval of the $20 billion bond issue. Likewise, prior decisions of this Court require that we approve the highway bond proposal. [See, *Matter of the Petition of University Hospitals Auth.*, 1997 OK 162, 953 P.2d 314; *Indiana Nat'l Bank v. State Dept. of Human Services*, 1993 OK 101, 857 P.2d 53, 57; *U.C. Leasing, Inc. v. State ex rel. State Bd. of Public Affairs*, 1987 OK 43, 737 P.2d 1191, 1195; *Halstead v. McHendry*, 1977 OK 131, 566 P.2d 134, 138.]

¶ 17 Under Oklahoma's proposal, the Department of Transportation is directed to make payments to the Capitol Improvement Authority from the State Highway Construction and Maintenance Fund [Construction and Maintenance Fund][32] and from the State Transportation Fund [Transportation Fund].[33] The Construction and Maintenance Fund consists of all monies received by taxation or otherwise for use on the state high-

---

**31.** The New York Const. art. VII, § 11 provides in pertinent part:

"Except the debts or refunding debts specified in sections 9, 10 and 13 of this article, no debt shall be hereafter contracted by or in behalf of the state, unless such debt shall be authorized by law, for some single work or purpose, to be distinctly specified therein. No such law shall take effect until it shall, at a general election, have been submitted to the people, and have received a majority of all the votes cast for and against it at such election nor shall it be submitted to be voted on within three months after its passage nor at any general election when any other law or any bill shall be submitted to be voted for or against...."

The New York Const. art. VII, § 8 provides in pertinent part:

"1. The money of the state shall not be given or loaned to or in aid of any private corporation or association, or private undertaking; nor shall the credit of the state be given or

loaned to or in aid of any individual, or public or private corporation or association, private undertaking, but the foregoing provisions shall not apply to any fund or property now held or which may hereafter be held by the state for educational, mental health or mental retardation purposes...."

The New York Const. art. X, § 5 provides in pertinent part:

"... Neither the state nor any political subdivision thereof shall at any time be liable for the payment of any obligations issued by such a public corporation heretofore or hereafter created, nor may the legislature accept, authorize acceptance of or impose such liability upon the state or any political subdivision thereof ..."

**32.** Title 73 O.S. Supp.1997 § 168.6(E), see note 36, infra.

**33.** Title 73 O.S. Supp.1997 § 168.6(G), see note 36, infra.

ways.[34] Pursuant to 69 O.S.1991 § 1501.1,[35] the Transportation Fund is composed of taxes on motor fuels and other revenues. The Transportation Fund is specifically earmarked for:

"... the construction, repair and maintenance of state highways; for other transportation systems; and for such other transportation purposes as the Legislature may authorize."

In *Schulz* and here, payments are to be made under leasing provisions and the repairs and improvements are to be paid from a tax on the use of state highways. In Oklahoma's case, a portion of the payment will come from a fund specifically set up for that purpose— the Transportation Fund. Construction, maintenance, and repair of state highways and bridges will be paid for precisely by the parties who utilize them. In New York and in Oklahoma, the bond purchasers are clearly advised that: 1) retirement of the debts created depends on the decision of the Legislature to make sufficient appropriations; 2) there is no pledge of the full faith and credit of the state; and 3) the obligations do not create debts of the state.

## III.

¶ 18 **THE CONSTITUTIONALITY OF MULTI–YEAR AGREEMENTS IS NOT GOVERNED BY PRINCIPLES OF SELF–LIQUIDATION.**

¶ 19 The analysis presented in Proposition II demonstrates that the dedicated revenue stream described in the authorizing statutes satisfies the standard of self-liquidation as described in our prior decisions. Even if it did not, or even if the highway proposal were not *fully* self-liquidating, this Court's prior decisions would not warrant its invalidation.

¶ 20 In *U.C. Leasing, Inc. v. State ex rel. State Bd. of Public Affairs*, 1987 OK 43, 737 P.2d 1191, 1195, the lease at issue covered communications switching equipment. In *Indiana Nat'l Bank v. State Dept. of Human Services*, 1993 OK 101, 857 P.2d 53, 57, the lease was for computer equipment. No one contended in *U.C.* or in *Indiana Bank* that any revenue would arise even tangentially from the installation of the equipment. At the minimum, the Legislature may reasonably have concluded that improvement in Oklahoma's road system will play a major factor in business location decisions; that the improvements will provide tens of thousands of jobs; and that the location of technologically advanced businesses in Oklahoma will result in higher paying jobs for taxpayers which will generate more taxes. A first rate economy depends on a first rate transportation system.

¶ 21 Here, the bonds issued under 73 O.S. Supp.1997 § 168.6 [36] are to be retired from legislatively appropriated funds paid from the Oklahoma Department of Transportation [Transportation] under a leasing

---

**34.** Title 69 O.S.1991 § 1501 provides in pertinent part:

"(a) All monies received by taxation or otherwise for use on the state highways of this state shall, unless otherwise provided by law, be placed in the State Treasury in a fund to be known as the State Highway Construction and Maintenance Fund...."

**35.** Title 69 O.S.1991 § 1501.1 provides:

"A. There is hereby created in the State Treasury a fund to be designated as the 'State Transportation Fund'. The fund shall be subject to legislative appropriation and shall consist of revenues apportioned to such fund by provisions of the Oklahoma Statutes imposing taxes upon various motor fuels and of such other revenues as may be provided by law. B. The State Transportation Fund shall be used for appropriations for the construction, repair and maintenance of state highways; for other transportation systems; and for such

other transportation purposes as the Legislature may authorize."

**36.** Title 73 O.S. Supp.1997 § 168.6 provides in pertinent part:

"A. The Oklahoma Capitol Improvement Authority is hereby authorized to issue bonds or other negotiable instruments or evidences of indebtedness in the principal amount sufficient to generate Three Hundred Million Dollars ($300,000,000.00) in proceeds available to fund the construction and improvement of the highway system in this state as set forth in this act.

B. The proceeds from the sale of obligations authorized in subsection A of this section shall only be used by the Authority to fund the construction, improvement, maintenance, and repair of roads, highways and bridges to be designed and constructed by the Oklahoma Department of Transportation as designated in Section 3 of this act or to fund other costs

agreement to the Oklahoma Capitol Improvement Authority over a period of ten years. There is no absolute or legally binding commitment in § 168.6 obligating Transportation to make the payments. The payments will be made "subject to receiving an annual appropriation" from the Legislature.[37] The statute provides that "[i]t is the intent" of the Legislature to appropriate sufficient monies to retire the debt created.[38]

¶ 22 The source of the intended annual appropriations is, of course, no mystery. It is the combination of motor fuel and special fuel taxes combined with vehicle and license and registration fees. When the origination of the actual payments are traced, this transaction does not differ from arrangements where state buildings are rented by state agencies pursuant to multi-year leases. The money for both transactions comes from the same coffer—state monies. The building is constructed from state funds and the rent is paid from annual appropriations from the Legislature. Here, state highways are being constructed and they are being paid for by state appropriations. The difference, if any, is that the revenue stream from the payment of the highway bonds is from a more reliable source.

associated with the issuance of such obligations.

C. The obligations issued pursuant to authority of subsection A of this section shall be repaid in full within ten (10) years from the date of issuance.

D. The obligations issued pursuant to authority of subsection A of this section shall be retired by payments made to the Oklahoma Capitol Improvement Authority from the Oklahoma Department of Transportation. The Oklahoma Capitol Improvement Authority and the Oklahoma Department of Transportation shall be authorized to enter into leases and agreements with respect to the use of roads, highways and bridges, as applicable, the construction, improvement, maintenance, or repair of which is financed with any proceeds from the issuance of obligations authorized in subsection A of this section.

E. The Oklahoma Department of Transportation shall make payments to the Oklahoma Capitol Improvement Authority for the use of any roads, highways or bridges financed from any proceeds of the obligations authorized in subsection A of this section pursuant to the agreement. The Oklahoma Department of Transportation shall make the payments from the State Highway Construction and Maintenance Fund in the manner specified by the agreement and subject to receiving an annual appropriation for that purpose. It is the intent of the Legislature to appropriate to the Oklahoma Department of Transportation State Transportation Fund sufficient monies to make payments to the Authority for the purposes of retiring the debt created pursuant to this section.

F. The bond indenture or other instrument pursuant to which the Oklahoma Capitol Improvement Authority becomes obligated for the repayment of principal and interest of the proceeds from the sale of obligations authorized in subsection A of this section shall provide that all obligations are to be repaid from the source of revenue specified in this section.

G. The Oklahoma Department of Transportation shall make payments from the State Transportation Fund to pay obligations incurred pursuant to agreements with the Oklahoma Capitol Improvement Authority for the use of roads, highways and bridges the construction, improvement, maintenance, or repair of which is financed with any proceeds from the issuance of obligations authorized pursuant to subsection A of this section. No payment from the State Transportation Fund using the monies appropriated pursuant to this act shall be made for any other purpose.

H. It is the intent of the Oklahoma Legislature to maintain the funding level of the State Transportation Fund as required in order for the Department of Transportation to fully pay any and all obligations incurred by the Department of Transportation with respect to agreements entered into by the Department of Transportation and the Oklahoma Capitol Improvement Authority pursuant to subsection D of this section.

I. The bonds or other obligations issued pursuant to this section shall not at any time be deemed to constitute a debt of the state or of any political subdivision thereof or a pledge of the faith and credit of the state or of any such political subdivision.

J. Such bonds or other obligations shall contain on the face thereof a statement that neither the faith and credit nor the taxing power of the state or any political subdivision thereof is pledged, or may hereafter be pledged, to the payment of the principal of or the interest on such bonds...."

**37.** Title 73 O.S. Supp.1997 § 168.6(E), see note 36, supra.

**38.** Title 73 O.S. Supp.1997 § 168.6(H), see note 36, supra.

## IV.

¶ 23 **BONDS WHICH DO NOT CREATE A LEGAL OBLIGATION TO PAY BEYOND THE CURRENT ANNUAL APPROPRIATION ARE NOT DEBTS. BECAUSE THE BOND PROPOSAL DOES NOT CREATE A DEBT, THE BUDGET BALANCING AMENDMENTS OF THE OKLA. CONST. ART. 10 §§ 23, 24, AND 25 ARE INAPPLICABLE.**

¶ 24 The issue of whether so called "moral obligation" bonds [39] are "debts" within the meaning of constitutional provisions similar to the Oklahoma Constitution art. 10, §§ 23,[40] 24 [41] and 25 [42] is nothing new in either Oklahoma or national jurisprudence.[43] Over twenty years ago, this Court analyzed the existence of a municipality's "moral obligation" to continue a lease arrangement until underlying bond obligations could be satisfied. In so doing, we looked at the Oklahoma Constitution, art. 10, § 26 [44]. [Art. 10, § 26 applies to political subdivisions and is the counterpart of art. 10, § 25, requiring that before the state may enter into certain "debts", a vote of the public is required.]

■ ¶ 25 In *Halstead v. McHendry*, 1977 OK 131, 566 P.2d 134, 138, we held that evidence of a "moral obligation" constituted no legal impediment to the validity of a lease agreement and underlying revenue raising bonds designated for the building of a community health center. We reached that result by acknowledging that constitutional debt-limitation provisions similar to those at issue here relate to:

"... legally enforceable obligations and not to moral obligations. The fact that the lease agreement might be continued until the bonds are retired serves no basis for voiding the agreement ..."

Promises of an expressed Legislative "intent" to continue the funding of a revenue raising project are not "debts" within the meaning of constitutional debt-limitation provisions.

---

**39.** This is a term coined in the 1960's to describe appropriation-risk bonds that could not legally bind a legislature beyond a session but would create a "moral" obligation to appropriate money should a public authority be unable to redeem its bonds. *Schulz v. State*, see note 54, 616 N.Y.S.2d at 351, 639 N.E.2d at 1148, infra; D. Mandelker, *State & Local Government in a Federal System*, p. 321 (3d ed.1990). The term "moral obligation" has a longer history. See footnote 46, infra, and accompanying text.

**40.** The Okla. Const. art. 10, § 23, see note 2, supra.

**41.** The Okla. Const. art. 10, § 24, see note 3, supra.

**42.** The Okla. Const. art. 10, § 25, see note 4, supra.

**43.** In re *Anzai*, see note 54, infra; *Wilson v. Kentucky Trans. Cabinet*, see note 54, infra; *Schulz v. State*, see note 54, infra; *Dieck v. Unified School Dist. of Antigo*, see note 54, infra; *Dykes v. Northern Virginia Transportation Dist. Comm'n* see note 54, infra; *Department of Ecology v. State Finance Committee*, see note 54, infra; *State v. School Bd. of Sarasota County*, see note 54, infra; *State v. Goldschmidt*, see note 54, infra; *Caddell v. Lexington County School Dist. No. 1*, see note 54, infra; *Municipal Bldg. Auth. of Iron County v. Lowder*, see note 54, infra; *Glennon Heights, Inc. v. Central Bank & Trust*, see note 54, infra; *Baliles v. Mazur*, see note 54,

infra; *Enourato v. New Jersey Bldg. Auth.*, see note 54, infra; *Ruge v. State*, see note 54, infra; *Edgerly v. Honeywell Information Sys., Inc.*, see note 54, infra; *McFarland v. Barron*, see note 54, infra; *Berger v. Howlett*, see note 54, infra; *Book v. State Office Bldg. Comm'n*, see note 54, infra; *Duff v. Jordan*, see note 54, infra; *State v. Armory Bd*, see note 54, infra. See also, *Texas Pub. Bldg. Auth. v. Mattox*, note 54, infra; *St. Charles City–County Library v. St. Charles Library Bldg. Corp.*, note 54, infra; *Opinion of the Justices*, see note 54, infra; *State v. Giessel*, note 54, infra; *State v. Donahey*, see note 54, infra. But see, *Montano v. Gabaldon*, note 54, infra; *State ex rel. Nevada Bldg. Auth.*, note 54, infra.

**44.** The Okla. Const. art. 10, § 26 provides in pertinent part:

"(a) Except as herein otherwise provided, no county, city, town, township, school district, or other political corporation, or subdivision of the state, shall be allowed to become indebted, in any manner, or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year without the assent of three-fifths of the voters thereof, voting at an election, to be held for that purpose ..."

The current version of the Constitution is cited. Although the provision has been amended since this Court promulgated *Halstead v. McHendry*, 1977 OK 131, 566 P.2d 134, the quoted language remains unchanged from the version in effect when the decision was rendered.

¶ 26 In *Halstead*, although the voters approved a resolution providing for the levy of a tax to assist in the maintenance of a health department, no election was held under the provisions of the Oklahoma Constitution art. 10, § 26 before the leasing agreement and bond issue were completed. Retirement of the revenue raising bonds depended on the continuance of the leasing relationship over a period of fifteen years. In upholding the *Halstead* financing plan, the Court discounted arguments that actions of the present County Commissioners in executing the lease would "morally" obligate succeeding County Commissioners to continue the arrangement in future years. Rather, we found that the continuance of the leasing arrangement depended entirely upon the actions of the County Commissioners who would consider its renewal.

¶ 27 The renewal of the lease in *Halstead* was governed by the County Commissioners in office at the time the lease was presented. The lease was renewed on a year-by-year basis. Here, the highway bond program is also subject to an annual review by current members of the legislative body. The Legislature will determine on a year-by-year basis in the appropriation process whether road improvements should be funded through the appropriations to the Highway Department. This Court recognized in *Halstead* that although the County Commissioners might feel a moral obligation to continue the lease, there was no legal obligation to do so, and thus no impediment to approval of the leasing agreement—the agreement was constitutional. The fact that the Legislature might, under the highway program, feel some moral obligation to continue the agreement or to ensure that highways are provided for all citizens of this state does not mean that it is legally obligated, and therefore, the Okla. Const. art. 10, §§ 23, 24, and 25 are neither implicated nor applicable—the bonds, like the leasing agreement in *Halstead*, are constitutional.

¶ 28 Ten years after *Halstead*, in *U.C. Leasing, Inc. v. State ex rel. State Bd. of Public Affairs*, 1987 OK 43, 737 P.2d 1191, 1195, we upheld a leasing arrangement span-

ning a period of sixty consecutive months. The lease agreement in *U.C.* explicitly provided that if the Legislature failed to allocate funds for payment, the obligation would cease at the end of the term for which there were allocated funds. Although it did not speak of "moral obligations" in *U.C.*, the Court did recognize that there was no binding promise to continue the lease. Instead, its terms were contingent upon the Legislature's providing funding on an annual basis. The *U.C.* Court said:

"Where a person or entity enters into a valid contract with the proper State officials and a valid appropriation has been made therefore, the State has consented to be sued and has waived its governmental immunity to the extent of its contractual obligations and such contractual obligation may be enforced against the State in an ordinary action at law."

It clearly limited the extent of the legal obligation to pay in *U.C.* to the extent that a "valid appropriation" had been made—precisely the situation outlined in 73 O.S. Supp. 1997 § 168.6 as the limiting legal factor for payment of the bond obligations.[45]

## V.

¶ 29 **THERE IS NO CONSTITUTIONAL DIFFERENCE BETWEEN LEASING EQUIPMENT AND LEASING ROADS. MULTI–YEAR COMMITMENTS, MULTI–YEAR LEASES, MULTI–YEAR RENTALS, AND MULTI–YEAR CONTRACTS ARE ALL BASED ON THE SAME LEGAL PRINCIPLES.**

¶ 30 In *Indiana Nat'l Bank v. State ex rel. Dept. of Human Services*, 1993 OK 101, 857 P.2d 53, 57, the Court "cleared up" the misconception that, in a lease for the acquisition of computer equipment—a non-revenue producing item, a State agency could not enter into a lease/purchase agreement which would bind the State for a future fiscal year if it were conditioned solely on continued fiscal year appropriations by the Legislature. DHS believed that this was unconstitutional, and that the agreement had to contain a

---

**45.** Title 73 O.S. Supp.1997 § 168.6, see note 36, supra.

clause allowing termination at the end of each fiscal year. In explaining the fallacy of this excessively narrow view of the debt limitation provision, the Court reiterated the position it took in *U.C.*, stating:

> "After the matters pertinent to this case transpired we decided *U.C. Leasing, Inc. v. State Board of Public Affairs,* 737 P.2d 1191 (Okla.1987), an opinion which cleared up the area of the law involving acquisitions of such equipment by State entities. In *U.C. Leasing* we held that State constitutional and statutory fiscal year limitation clauses were *not* violated where a 60 month lease (a State agency as lessee) explicitly provides that if the Legislature fails to allocate or appropriate funds for payment, lessee is not obligated to pay beyond the period for which funds have been allocated. *Id.* At 1195. The converse of this would, of course, be true, i.e. the agency would be bound if adequate appropriations were made by the Legislature. This is so because the obligation is not absolute and in all events binding on the State, but is contingent upon continued funding on a fiscal year basis by the Legislature continuing to appropriate funds to satisfy the obligation. *Id.* Thus, it turns out DHS, as all now appear to concede, was wrong in its view on what could be agreed to in regard to the lease/purchase agreement."

There is no constitutional difference between leasing equipment and leasing roads. Long-term commitments, multi-year leases and contracts, have previously been upheld by this Court. Despite DHS's confusion in *Indiana Nat'l Bank,* this Court said the matter had been settled—multi-year commitments expressly made contingent on future legislative appropriations did not violate constitutional debt limitation provisions.

¶ 31  Here, the Capitol Improvement Authority is not liable for the face value of the bonds regardless of whether appropriations are made, nor is it subject to suit for the entire amount of the face value of the bonds. Title 73 O.S. Supp.1997 § 168.6(F)[46] states

that the bond indenture or other instrument issued by the Authority "shall provide that all obligations are to be repaid from the source of revenue specified in this section." Clearly, the obligation created is limited by the expressly contingent nature of the future legislative appropriations to be made—not by the face value of the bond indentures. Because the legal liability of the Authority is limited to the amount of its annual appropriation, the debt limitation provisions of the Okla. Const. art. 10, §§ 23, 24, and 25 never come into play.[47]

¶ 32  As we now see, the correct analysis turns not on the type of instrument involved but, rather, on whether an enforceable obligation is created beyond the fiscal year. This principle of analysis is buttressed by 62 O.S.1991 § 582(8) which provides a functional definition of obligations but does not distinguish between types of transactions. The statute does not support a distinction which separates bond transactions from leases. This section states:

> " 'Obligation' means an agreement of a public entity to pay principal and any interest thereon, whether in the form of a contract to repay borrowed money, a lease, an installment purchase contract, or otherwise, and includes a share, participation or other interest in any agreement."

¶ 33  This analysis is further strengthened by 12A O.S.1991 § 3–103(9), a codification of basic contract law, in which a promise is defined:

> " 'Promise' means a written undertaking to pay money signed by the person undertaking to pay. An acknowledgment of an obligation by an obligor is not a promise unless the obligor also undertakes to pay the obligation."

¶ 34  The clincher is a statute which has been with us since 1890[48]—when Oklahoma was Indian Territory—and which was incorporated into statutory law at statehood. Moral obligation is nothing new, it has been

---

**46.** Title 73 O.S. Supp. § 168.6(E), see note 36, supra.

**47.** See, Proposition IX, infra.

**48.** Okla. Stat. Ch. 17, § 38 (Ind.Terr.1890).

with us always.[49] Title 15 O.S.1991 § 107 was with us before statehood, was incorporated into law at statehood, is now, and probably always shall be. It provides:

"An existing legal obligation resting upon the promisor, or a moral obligation originating in some benefit conferred upon the promisor, or prejudice suffered by the promisee, is also good consideration for a promise, to an extent corresponding with the extent of the obligation, but no further or otherwise."

The concept of moral obligation contracts did not pose a problem to framers of the Constitution who were elected to Oklahoma's first Legislature.

## VI:

¶ 35  **THESE BONDS ARE NOT OBLIGATIONS OR DEBTS BECAUSE THERE IS NO LEGALLY ENFORCEABLE PROMISE WHICH BINDS A FUTURE LEGISLATURE TO APPROPRIATE FUNDS.**

¶ 36  In the leasing cases, this Court recognized that vendors were willing to enter multi-year transactions with the state notwithstanding the lack of an enforceable promise to pay beyond the current fiscal year. Perhaps the framers of Oklahoma's debt limitation provisions cannot be presumed to have anticipated a financially sophisticated society in which goods and services are purchased successfully without the pledge of the full faith and credit of the state, but the constitutional language does not prohibit it. We were informed at oral argument that the same awareness has spread to the bond market. The legal principles are the same regardless of the monetary amount of the undertaking.

¶ 37  The distinction in *Application of Oklahoma Capitol Improvement Auth.*, 1960 OK 207, 355 P.2d 1028, 1032–33 is not in whether leases and bonds are different for constitutional-debt purposes. Rather, the Court noted that, in a sense, *any* contract to pay money in the future would create a debt, but that courts generally exclude contracts payable in installments if the consideration is also to be provided in the future. That is precisely the situation presented here—any payment the bond purchasers receive will hinge on the independent decision of future legislatures to make the anticipated appropriations.

¶ 38  An earlier case, *Application of Oklahoma Educational Television Auth.*, 1954 OK 219, 272 P.2d 1027, also provides guidance. In *Television Authority*, future legislatures were required to appropriate all funds accruing to the Public Building Fund in future years to retirement of the bonds. On p. 1029, the Court outlines the following as one of the issues it must determine:

" '(4) That the revenue pledged for the payment of said bonds cannot be diverted or appropriated to other purposes by future Legislatures as long as there are bonds of the Authority outstanding and unpaid.' "

In reference to this issue, the Court states on p. 1030:

"In reference to the fourth point above quoted it seems clear that since this particular revenue is irrevocably pledged for the payment of said bonds, that the same cannot be diverted or appropriated for other purposes by future Legislatures as long as there are bonds of the Authority outstanding and unpaid."

Unquestionably, provisions obligating future legislatures are unconstitutional. However, here, there simply is nothing to bind future legislative bodies to make the anticipated appropriations. Future revenues are not irrevocably pledged although increased travel will result in increased funds specifically earmarked, through the State Transportation Fund, for retirement of the proposed bonds. The present Legislature's intent to appropriate the monies is not a binding commitment on future Legislatures to do so.[50]

---

**49.** In the context of "appropriation-risk" bonds, the term appears to date back to the 1960's, *Schulz v. State,* see note 54 at 248, 616 N.Y.S.2d 343, 639 N.E.2d 1140, infra.

**50.** See discussion, pp. 765–767, supra; and 73 O.S. Supp.1997 § 168.6(H), note 36, supra, stating that there is only an "intent" to maintain funding levels sufficient to retire the bonds.

¶ 39 Also illustrative of the fact that future legislatures may not be bound by former legislatures are *Excise Bd. of Carter County v. Chicago, R.I. & P. Ry. Co.*, 1932 OK ——, 152 Okla. 120, 3 P.2d 1037 and *Boardman Co. v. Board of Comm'rs of Ellis County*, 1929 OK ——, 136 Okla. 85, 276 P. 474. These causes involved attempts by private parties to enforce judgments for expenditures for bridge repair, and the Court held that attempts to incur indebtedness without a vote of the people for the repair and rebuilding of public bridges was unconstitutional. Neither involved legislation similar to that at issue here. Instead, in both causes, the private parties alleged that legislation allowing for repair and reconstruction of county bridges supported payment of the judgments. The Court disagreed, noting that nothing in the legislation provided for the incurrence of a debt in excess of either the income or revenue for the current fiscal year. The Court found in *Carter County* and in *Boardman* that nothing in the respective legislation allowed for the incurrence of debts in one fiscal year to be paid out of revenues of a succeeding fiscal year. Here, there is no pledge of future income, all the monies bond holders can expect to recover are actual appropriations made by individual legislative bodies.

¶ 40 It is obvious that *Application of Oklahoma Capitol Improvement Auth.*, 1960 OK 207, 355 P.2d 1028; *Application of Oklahoma Educational Television Auth.*, 1954 OK 219, 272 P.2d 1027; *Excise Bd. of Carter County v. Chicago, R.I. & P. Ry. Co.*, 1932 OK ——, 152 Okla. 120, 3 P.2d 1037; and *Boardman Co. v. Board of Comm'rs of Ellis County*, 1929 OK ——, 136 Okla. 85, 276 P. 474, are distinguishable from the bond proposal presented here. Even if they were not, they have been implicitly overruled by *Matter of the Petition of University Hospitals Auth.*, 1997 OK 162, 953 P.2d 314; *Halstead v. McHendry*, 1977 OK 131, 566 P.2d 134;

*U.C. Leasing, Inc. v. State ex rel. State Bd. of Public Affairs*, 1987 OK 43, 737 P.2d 1191; and *Indiana Nat'l Bank v. State Dept. of Human Services*, 1993 OK 101, 857 P.2d 53.

## VII.

¶ 41 THE FISCAL POLICY OF THE STATE IS BUILT UPON THE PRECEDENTS OF THIS COURT, AND THE LEGISLATIVE AND EXECUTIVE DEPARTMENTS OF GOVERNMENT ARE ENTITLED TO PREDICTABILITY AND STABILITY IN DECISIONS WHICH AFFECT THE PUBLIC PURSE.

¶ 42 The people, as well as the legislative and the executive departments of government are entitled, especially in matters of the state purse, to count on predictability. This enactment, providing for the improvement of roads and bridges, had broad-based, bi-partisan support, and it charts the course of transportation systems improvement and economic development for the state based upon years of prior precedent that has been well understood.

■ ¶ 43 The Legislature is fully aware of our previous decisions. In apparent recognition of this Court's approval of multi-year financing in *U.C. Leasing, Inc. v. State ex rel. State Bd. of Public Affairs*, 1987 OK 43, 737 P.2d 1191, the Legislature passed the Oklahoma Bond Oversight Reform Act (Bond Oversight Act), 62 O.S.1991 § 695.1, *et seq.*, effective July 1, 1987. It set forth procedures regarding the sale and the issuance of bonds or other obligations by state governmental entities essential to the economic well being of the state.[51] Governmental entities within the meaning of the Act include any agency, board, commission, authority, department, public trust of which the state is the beneficiary or other instrumentality of government.[52] The Oklahoma Capitol Improve-

---

**51.** Title 62 O.S.1991 § 695.2 provides in pertinent part:

"The Legislature hereby finds and declares that there is a need to reform current procedures regarding the sale and issuance of bonds or other obligations by State Governmental Entities which are hereby declared to be essential to the economic well being of the state...."

The Legislature further declares that there exists a need to establish such minimal oversight to protect the public welfare of the State of Oklahoma."

**52.** Title 62 O.S.1991 § 695.3(4) provides:

" 'State Governmental Entity' means the State of Oklahoma or any agency, board, commis-

ment Authority falls squarely within the purview of the Bond Oversight Act.

¶ 44 It is clear that the public functions and purposes of the state are all tied to a financing plan and funding mechanism which is dependent upon the issuance of bonds. The Bond Oversight Act makes no distinction between retiring the bond obligations from rental payments, user fees, or any other payment made by an officer, department, board, commission, institution or agency of the state when the payment is to pay the pledged obligation for the current fiscal year.[53] These bonds will be retired, whether directly or indirectly, at least partially from annual legislative appropriations.

¶ 45 If we were, at this stage of our fiscal history, to abruptly change our mind and find that multi-year leasing agreements are unconstitutional, we would seriously jeopardize future economic development and replace certainty and progress with legal chaos in which state government financing would come to a standstill while the political branches painfully try to sort out the consequences of a change in the Court's jurisprudence.

## VIII.

¶ 46 THIS COURTS PREVIOUS DECISIONS CANNOT BE DISTINGUISHED. UNLESS *HALSTEAD v. McHENDRY, U.C. LEASING, INC. v. STATE ex rel. STATE BD. OF PUBLIC AFFAIRS, BOSWELL v. STATE; INDIANA NAT'L BANK v. STATE ex rel. DEPT. OF HUMAN SERVICES, APPLICATION OF STATE ex rel. DEPT. OF HUMAN SERVICES,* AND *MATTER OF THE PETITION OF UNIVERSITY HOSPITALS AUTH.* ARE OVERRULED. *STARE DECISIS* MANDATES APPROVAL OF THE BONDS.

¶ 47 *Stare decisis* mandates the approval of the proposed bonds. Multi-year leasing and bonds rest upon the same cases and upon the same legal foundation. Prohibiting one must necessarily jeopardize the other. The operative principles are potentially far reaching and may apply in seemingly unrelated contexts.

¶ 48 Pursuant to *Halstead v. McHendry,* supra; *U.C. Leasing, Inc. v. State ex rel. State Bd. of Public Affairs,* supra; *Boswell v. State,* infra; *Indiana Nat'l Bank v. State Dept. of Human Services,* supra; and *Matter of the Petition of University Hospitals Auth.,* supra; and the majority of jurisdictions[54]

---

sion, authority, department, public trust of which the state is the beneficiary or other instrumentality of state government, other than a public trust with the state as beneficiary whose jurisdiction is limited to one county, including, but not limited to the following:
a. Oklahoma Municipal Power Authority,
b. Oklahoma Development Authority,
c. Oklahoma Industrial Finance Authority,
d. Grand River Dam Authority,
e. Oklahoma Water Resources Board,
f. Northeast Oklahoma Public Facilities Authority,
g. Oklahoma Turnpike Authority,
h. Oklahoma Housing Finance Authority, and
i. Oklahoma Public, Industrial and Cultural Facilities Authority."

53. Title 62 O.S. Supp.1994 § 695.8(A)(1) and (3) provide in pertinent part:

"A. The Executive Bond Oversight Commission and the Legislative Bond Oversight Commission shall:
(1) Make determinations as to whether the purposes for which obligations proposed to be issued by a state governmental entity are for the furtherance and accomplishment of autho-

rized and proper public functions or purposes of the state or of any county or municipality
. . .
(3) Review proposed issuances of obligations to fund capital additions or expenditures by local governmental entities which obligations are to be retired by rental payments from the state, user fees from the state or any other such payment made by any officer, department, board, commission, institution or agency of the state, for compliance with any applicable provisions of federal, state or other laws, when such payment is a direct and expressed pledge for the then current fiscal year made by the state for the retirement of debt by a local governmental entity...."

54. *In re Anzai,* 85 Hawai'i 1, 936 P.2d 637, 642 (1997); *Wilson v. Kentucky Trans. Cabinet,* 884 S.W.2d 641, 644–45 (Ky.1994); *Schulz v. State,* 84 N.Y.2d 231, 616 N.Y.S.2d 343, 639 N.E.2d 1140, 1148 (1994); *Dieck v. Unified School Dist. of Antigo,* 165 Wis.2d 458, 477 N.W.2d 613, 618 (1991); *Dykes v. Northern Virginia Transportation Dist. Comm'n,* 242 Va. 357, 411 S.E.2d 1, 4 (1991), cert. denied, 504 U.S. 941, 942, 112 S.Ct. 2275, 2277, 119 L.Ed.2d 201, 203; *Department*

considering the effect of financing mechanisms comparable to the one mandated by 73 O.S. Supp.1997 § 168.6, the obligations created are not "debts" within the meaning of constitutional and statutory provisions similar to the Oklahoma Constitution art. 10, §§ 23, 24 and 25. Under these cases, the financing procedures are not "debts" either because the enacting body is not bound legally to make future appropriations or because it is clear that the legislators did not intend them to be obligations of the states or their subdivisions. Both these conditions exist under 73 O.S. Supp.1997 § 168.6.

¶ 49 The opponents of the bond issue urge the applicability of *Boswell v. State,* 1937 OK ——, 181 Okla. 435, 74 P.2d 940. A finding that these proposed bonds are constitutional does not require that we overrule *Boswell.* There, the Court acknowledged that a simple declaration by the Legislature that the bonds were not to be considered a debt of the State or of its political subdivision was not dispositive of the cause, and it held that the bonds created unauthorized "debts" within the meaning of the Oklahoma Constitution art. 10, §§ 23, 24 and 25. However, the facts here are distinguishable from those in *Boswell* in two critical respects. In *Boswell,* there was: 1) an unequivocal pledge of taxes to the retirement of the bonds; and 2) the promise bound subsequent legislative officers to continue appropriations. Neither situation exists in this cause. There simply

is no legally enforceable promise to appropriate funds or any responsibility imposed on future legislatures to do so. In fact, *Boswell* requires the opposite result. This Court defined the Legislature's role in fiscal matters and its limitations in *Boswell:*

> "As we conceive it, the constitutional provisions dealing with the 'debt limit' of the state were adopted for the purpose of fixing the power and responsibility of legislation relating to the fiscal affairs of the state upon the existing legislative assembly, and to prevent one legislative assembly from laying its mandate upon a future one. The effect of these provisions is that one legislative assembly cannot guarantee the span of life of its legislation relating to the fiscal affairs of the state beyond the period of its biennium. These provisions of the Constitution guarantee that the power of a subsequent legislative body either to acquiesce or repeal shall always be existent."

One Legislature cannot bind another. That is precisely why the full faith and credit of the state of Oklahoma is *not* pledged here; why no debt is created; why the balanced budget amendment is not called into play; and why this agreement is not unconstitutional.

¶ 50 We recently approved a fifty-year lease in *Matter of the Petition of University Hospitals Auth.,* 1997 OK 162, 953 P.2d 314,

*of Ecology v. State Finance Committee,* 116 Wash.2d 246, 804 P.2d 1241, 1246 (1991); *State v. School Bd. of Sarasota County,* 561 So.2d 549, 552 (Fla.1990); *State v. Goldschmidt,* 308 Or. 573, 783 P.2d 988, 995 (1989); *Caddell v. Lexington County School Dist. No. 1,* 296 S.C. 397, 373 S.E.2d 598 (1988); *Municipal Bldg. Auth. of Iron County v. Lowder,* 711 P.2d 273, 277 (Utah 1985); *Glennon Heights, Inc. v. Central Bank & Trust,* 658 P.2d 872, 877–78 (Colo.1983); *Baliles v. Mazur,* 224 Va. 462, 297 S.E.2d 695, 697–98 (1982); *Enourato v. New Jersey Bldg. Auth.,* 90 N.J. 396, 448 A.2d 449, 455 (1982); *Ruge v. State,* 201 Neb. 391, 267 N.W.2d 748, 750–51 (1978); *Edgerly v. Honeywell Information Sys., Inc.,* 377 A.2d 104, 108 (Me.1977); *McFarland v. Barron,* 83 S.D. 639, 164 N.W.2d 607, 609–10 (1969); *Berger v. Howlett,* 25 Ill.2d 128, 182 N.E.2d 673, 675 (1962); *Book v. State Office Bldg. Comm'n,* 238 Ind. 120, 149 N.E.2d 273, 287 (1958); *Duff v. Jordan,* 82 Ariz. 228, 311 P.2d 829, 831 (1957); *State v. Armory Bd.,* 174 Kan. 369, 256 P.2d 143, 150 (1953). See also,

*Texas Pub. Bldg. Auth. v. Mattox,* 686 S.W.2d 924, 928 (Tex.1985); *St. Charles City–County Library v. St. Charles Library Bldg. Corp.,* 627 S.W.2d 64, 67 (1981) [Multi-year lease terminable at will of municipality did not create a debt within meaning of constitutional provisions.]; *Opinion of the Justices,* 335 So.2d 376, 379 (1976) [Contract spanning from one to twenty years is not a "debt" as defined by constitutional provision if annual amount payable is to be derived from current revenues received.]; *State v. Giessel,* 271 Wis. 15, 72 N.W.2d 577, 583 (1955) [Obligation to pay periodic rentals contingent upon enjoyment of property is not a debt or the loaning of the credit of the state.]; *State v. Donahey,* 93 Ohio St. 414, 113 N.E. 263 (1916) [Upholding lease subject to appropriations of the Legislature.] Despite the presence of nonappropriation clauses, some courts have invalidated lease financing. See, *Montano v. Gabaldon,* 108 N.M. 94, 766 P.2d 1328, 1329 (1989); *State ex rel. Nevada Bldg. Auth. v. Hancock,* 86 Nev. 310, 468 P.2d 333, 337 (1970).

in which we found that the Legislature had not violated art. 10, § 15 [55] of the Oklahoma Constitution. The fifty year funds for indigent care, in *University Hospitals*, like the monies to defray the costs of the proposed bonds here, come from legislative appropriations.

¶ 51 The indigent care agreement executed between the University and the health service provides in pertinent part:

"... (q) 'Subsidy' means the annual appropriation by the Legislature of the State of Oklahoma to the Authority for Indigent Care...."

Relying on *Burkhardt v. City of Enid*, 1989 OK 45, 771 P.2d 608, 611, we recognized in *University Hospitals* that the public benefits flowing to the State were sufficient to satisfy constitutional provisions prohibiting gifts to a private corporation. In *State ex rel. Brown v. City of Warr Acres*, 1997 OK 117, 946 P.2d 1140, this Court again recognized that economic development serves a legitimate public purpose for which public funds may be expended.

█ ¶ 52 Because the protestants did not raise the balanced budget amendments, art. 10 §§ 23 and 25,[56] they were not addressed by the Court. We could and probably should have done so, especially because of the fifty year indigent care provision. In matters *publici juris* the appellate court may use issues for resolution not tendered below.[57] Nevertheless, the outcome would be the same.

¶ 53 Were we to reach an opposite conclusion here, we would cloud the efficacy of this Court's prior case law, expressly: *Halstead v. McHendry*, supra; *U.C. Leasing, Inc. v. State ex rel. State Bd. of Public Affairs*, supra; *Boswell v. State*, supra; *Indiana Nat'l Bank v. State ex rel. Dept. of Human Services*, supra; and *Matter of the*

*Petition of University Hospitals Auth.*, supra, a decision promulgated less than ninety days ago. We cannot do so because of our consistent line of decades of case law dealing with methods of public finance.

### IX.

¶ 54 **BECAUSE THE BONDS STATE ON THEIR FACE THAT THE FULL FAITH AND CREDIT OF THE STATE IS NOT PLEDGED, AND BECAUSE THE BONDS DO NOT CREATE A LEGALLY ENFORCEABLE DEBT OF THE STATE, THE CAPITOL IMPROVEMENT AUTHORITY CAN ONLY BE SUED FOR THE MONEY TRANSFERRED BY ANNUAL APPROPRIATIONS FROM THE LEGISLATURE TO THE DEPARTMENT OF TRANSPORTATION FOR THE CAPITOL IMPROVEMENT AUTHORITY.**

█ ¶ 55 Although the Capitol Improvement Authority is an instrumentality of the state and subject to suit under some circumstances, the bonds do not become a debt of the state merely through the Authority's status. Bondholders could only sue the Authority for the money transferred from the Department of Transportation to the Capitol Improvement Authority. If the Authority doesn't have monies to retire the bonds, because legislative appropriations are not made, there is nothing for the bondholder to recover.

¶ 56 The statute specifically provides that bonds shall not at any time be deemed to constitute a debt of the state or of any political subdivision, and it requires that the bonds contain on their face a statement that neither the full faith and credit nor the taxing power of the state or any political subdivision is pledged for the payment of the

---

**55.** The Okla. Const. art. 10, § 15 provides in pertinent part:

"A. Except as provided by this section, the credit of the State shall not be given, pledged, or loaned to any individual, company, corporation, or association, municipality, or political subdivision of the State, nor shall the State become an owner or stockholder in, nor make donation by gift, subscription to stock, by tax,

or otherwise, to any company, association, or corporation...."

**56.** The Okla. Const. art 10, § 23, see note 2, supra; the Okla. Const. art 10, § 25, see note 4, supra.

**57.** *Matter of McNeely*, 1987 OK 19, 734 P.2d 1294, 1296.

principal and interest of the bonds. There is no legally enforceable contract between this State's Legislature and either the Authority, the Department or the citizens of this state to make the anticipated appropriations necessary to satisfy the debts created by the issuance of the bonds. At most, a "moral obligation" arises to continue funding.

## CONCLUSION

¶ 57 Roads are matters of statewide public policy concerns.[58] They are essential to travel in support of economic pursuits from farming to industrial development. They provide the avenue for all forms of commerce. They are the life-blood of Oklahoma and of every state. They, unlike indigent care, generate income through increased commerce and taxation. Regardless of whether a citizen drives, people are benefitted by the delivery of goods and services. The upkeep, repair and improvement of roads is a necessary and legitimate concern in economic development.

¶ 58 It has been shown that art. 10, §§ 23,[59] 24,[60] and 25[61] are inapplicable because no debt or obligation is created. It has also been shown that the Legislature's authority in this area does not rely solely on the general powers granted by the Okla. Const. art. 5, § 36.[62] Rather, art. 16, § 1[63] and art. 21 § 1[64] reflect the conviction of the framers of the Constitution that the Legislature has more specific responsibilities with respect to the state's transportation and the fashioning of institutional structures for enhancing it.

¶ 59 Title 68 O.S. Supp.1997 § 168.6 does not compel future legislatures to appropriate money for repayment of the issued bonds. Art. 10, § 23[65] of the Oklahoma Constitution prohibits one legislative body from binding a successive legislative entity. It does not create a debt against the state if the money is not appropriated. A creditor cannot compel the Legislature to make the anticipated appropriations. There is no debt in the constitutional sense. Nonetheless, the Legislature has designated a revenue stream from which non-binding annual appropriations may be made to amortize the bonds so that, in the constitutional sense, the bonds are self-liquidating.

¶ 60 This transaction is not misrepresented to the bond markets. We were told at oral argument that the bonds will be rated A+ without either insurance or the pledge of the full faith and credit of the state. The Court can neither make business decisions for bond purchasers nor micromanage their personal investment portfolios. Many bond purchasers will choose to buy these bonds because they are tax-exempt.[66] It is the market which determines the quality of the bonds and the perceived risk that investors are willing to take—not the Oklahoma Supreme Court. Purchasers of the bonds will be clearly advised that there is no guarantee of appropriations to ensure bond redemption and that the bonds are not backed by the full faith and credit of the state.

¶ 61 Almost everyone understands that Oklahoma sits at the crossroads of the nation. In order to be truly competitive with its sister states, it needs a modern road system constructed with modern financing

58. *Application of Oklahoma Turnpike Auth.*, 1950 OK ——, 203 Okla. 335, 221 P.2d 795.

59. The Okla. Const. art. 10, § 23, see note 2, supra.

60. The Okla. Const. art. 10, § 24, see note 3, supra.

61. The Okla. Const. art. 10, § 25, see note 4, supra.

62. The Okla. Const. art. 5 § 36, see note 8, supra.

63. The Okla. Const. art. 16 § 1, see page 4, supra.

64. The Okla. Const. art. 21 § 1, see note 9, supra.

65. The Okla. Const. art. 10, § 23, see note 2, supra. *Boswell v. State*, 1937 OK ——, 181 Okla. 435, 74 P.2d 940. See also, *Halstead v. McHendry*, note 44 at 138, supra.

66. Title 73 O.S. Supp.1997 § 168.6(N) provides:
"N. The obligations issued under this section, the transfer thereof and the interest earned on such obligations, including any profit derived from the sale thereof, shall not be subject to taxation of any kind by the State of Oklahoma, or by any country, municipality or political subdivision therein."

methods. The accomplishment of this urgent goal does not require either a leap of faith or new departures in the law. We need simply look to thirty years of case law, and to the law as it has developed in a majority of our sister states with similar constitutional provisions. It merely requires that we follow the doctrine of *stare decisis*.

**BOND PROPOSAL ISSUE HELD CONSTITUTIONAL.**

KAUGER, C.J., and SUMMERS, V.C.J., concur.

HODGES and HARGRAVE, JJ., concur specially.

SIMMS, J., concurs by reason of *stare decisis*.

LAVENDER, OPALA, ALMA WILSON and WATT, JJ., dissent.

HODGES, Justice, with whom KAUGER, C.J., joins, concurring specially:

¶ 1 Although I concur in today's pronouncement by the Court, I write separately to further emphasize that the bonds before this Court do not create a debt in violation of article 10, sections 23, 24, and 25. *See Boswell v. State,* 181 Okla. 435, 74 P.2d 940, 943 (1937). Title 73, section 168.6 of the Oklahoma Statutes, authorizing the bonds, states:

I. The bonds or other obligations issued pursuant to this section **shall not at any time by deemed, to constitute a debt of the state** or of any political subdivision thereof or **a pledge of the faith and credit of the state** or of any such political subdivision.

J. Such bonds or other obligations shall contain on the face thereof a statement that **neither the faith and credit nor the taxing power of the state** or any political subdivision thereof **is pledged, or may hereafter be pledged,** to the payment of the principal of or the interest on such bonds....

(Emphasis added.) The legislation does not require future legislative assemblies to provide funding to retire the bonds, but it does require the bonds to state, on their face, that the taxing power of the state is not pledged.

Holders of these bonds will have no recourse against the state for payment of the bonds if future legislative assemblies do not appropriate funds for their retirement. Therefore, the bonds are not debts of the state. Thus, the legislation authorizing the bonds does not undermine the balanced budget requirements of article 10, sections 23, 24, and 25. By specific and direct language in the legislation and bond agreements, there is *no* obligation, either legal or moral, for compliance by future legislative assemblies.

¶ 2 In addition to the bonds, the 1997 legislative assembly appropriated $50,000,000 from the Constitutional Reserve Fund (Rainy Day Fund), $9,160,339 from the State Transportation Fund, and $28,200,000 from the General Revenue Fund to fund the highway project. 1997 Okla. Sess. Laws ch. 380. This money was appropriated from funds available for appropriation to the 1997 legislative assembly. Unlike the bonds, the parties have not questioned the constitutionality of these appropriations. Clearly, these appropriations comply with article 10, sections 23, 24, and 25.

HARGRAVE, Justice, with whom KAUGER, C.J., and SIMMS, J., join, concurring specially:

¶ 1 As pointed out by the majority, every act of the legislature is presumed to be constitutional and is the starting point for analysis of the constitutionality of a legislative enactment. The majority also sets out the three Constitutional debt-limitation provisions for debts or obligations against the state, Article 10, §§ 23, 24 and 25. The majority concludes that because the bonds in question are self-liquidating and do not legally obligate either the state or future legislatures, none of the three Constitutional limitation provisions applies. Specifically, in Part IV of the opinion, the majority holds that bonds that do not create a legal obligation to pay beyond the current annual appropriation are not debts that are prohibited by the Constitution and that, therefore, §§ 23, 24 and 25 of Article 10 do not apply.

¶ 2 I concur with the majority in holding that the bonds herein are not prohibited by the Constitution, but I would go further and

find that a debt that does not create a legal obligation to pay beyond the current annual appropriation is specifically permitted by Article 10 § 23 of the Oklahoma Constitution. Article 10, § 23 provides:

> *"The state shall never create or authorize the creation of any debt or obligation, or fund or pay any deficit against the state,* or any department, institution or agency thereof, regardless of its form or the source of money from which it is to be paid, *except as may be provided in this section and in Sections 24 and 25 of Article X of the Constitution of the State of Oklahoma."* (emphasis added).

¶ 3 The quoted language recognizes that debts or obligations may be created or authorized by the state in three ways, under § 23, § 24 or § 25. Article 10, § 24 provides that *in addition to the above limited power to contract debts* (provided in § 23), the State may contract debts to repel invasions, suppress insurrection or to defend the state in war. Article 10 § 25 provides that all other debts contracted by or on behalf of the state, *except those specified in § 23 and § 24,* must be authorized by law for some work or object that will be paid for by the levy of a tax that shall be approved by a majority of the voters at a general election. Neither § 24 or § 25 applies to the situation before us.

¶ 4 Section 23 provides that prior to the convening of each regular session of the legislature, the State Board of Equalization shall certify the amounts available for appropriation and that legislative appropriations for any fiscal year shall not exceed it. All appropriations made in excess of the certification *shall be null and void.* The debts that lawfully may be created under Section 23 are those which incur no obligation to pay beyond the current annual appropriation.

¶ 5 Because 73 O.S. Supp.1997 § 168.6 does not create an obligation on the legislature to appropriate beyond its legislative term, I believe that the debt is specifically permitted by § 23. The majority opinion recites the various funding provisions used in 73 O.S. Supp.1997 § 168.6, which emphasizes that the bonds issued are to be retired by payments made from money appropriated annually by the Legislature to the Depart-

ment of Transportation, but is subject to the receipt of an annual appropriation for that purpose by the legislature and the bonds are to carry the source of funding on the face thereof. Thus, there is no debt created beyond an annual appropriation by the legislature and future legislatures are not bound, which I believe describes precisely the kind of debt permitted by § 23 of Article 10.

¶ 6 I am authorized to state that Chief Justice Kauger and Justice Simms join the views expressed herein.

LAVENDER, Justice, with whom OPALA, ALMA WILSON and WATT, JJ., join, dissenting.

¶ 1 In construing the provisions of the Oklahoma Constitution we must give effect to the intent of its framers and of the people who adopted it. *Boswell v. State,* 181 Okla. 435, 74 P.2d 940, 942 (1937). In my view, the intent of OKLA. CONST. art. 10, § 23, coupled with art. 10, § 25, is that Oklahoma State government—including highway projects—are to be funded on a cash, or pay-as-you-go basis, i.e. on a fiscal year plan, and that long-term debt reaching beyond the fiscal year may only be incurred by a vote of the people at the polls. In other words, the requirements of our Constitution, in plain and simple language, mandate that the Oklahoma Legislature provide for an annual balanced budget and that multi-year debts are prohibited unless approved by the citizens of this State at a general election.

¶ 2 The majority opinion, contrary to this clear mandate, upholds as constitutional a proposed three hundred million dollar ($300,-000,000.00) bond issue on the basis the State has no legal obligation to repay bondholders, even though the holders of the bonds will have conferred a $300,000,000.00 benefit upon all of our State's citizens by providing the funding for construction and improvement of Oklahoma's highway/road transportation system. In my opinion, the majority is allowing State officials to circumvent art. 10, §§ 23 and 25 by mistakenly accepting the view that future Legislatures will not be bound to appropriate sufficient revenues to repay the bondholders. Future Legislatures will not be able, in good faith, to refuse to

appropriate the money needed to pay this obligation because failure to do so, as Justice Watt has forcefully pointed out, "would be devastating to Oklahoma's credit worthiness and [would] cripple our ability to finance any project by future bond issues." From a realistic perspective, then, the State will, in fact, be obligated to repay the bonds and interest thereon, and if it does not a valid enforceable obligation would exist by virtue of the benefit conferred upon the State. To rule otherwise, as the majority does, simply ignores the economic reality of the situation and, at a minimum, permits violation of the spirit of our fundamental law, something I am unwilling to sanction.

¶3 If I were writing for the Court in this case, I would hold that before this obligation of $300,000,000.00 in multi-year debt be incurred, it must be submitted to the people for their approval at a general election and such authorization must be accompanied by a provision providing for a direct annual tax sufficient to pay the interest and principal on such debt, as art. 10, § 25 of the Oklahoma Constitution requires. Because the majority places its stamp of approval on the proposed bond issue without demanding compliance with this essential requisite of our fundamental constitutional law, I must respectfully dissent to the majority opinion in this matter.

OPALA, Justice, with whom LAVENDER, ALMA WILSON, and WATT, JJ., join, dissenting.

¶1 This case is *not* about the lenders' willingness to advance money to the State for a loan that may not be enforceable on default

---

1. Art. 10 § 23, Okl. Const., *prohibits* the State from *creating* or authorizing the creation of *any debt or obligation,* "regardless of its form or the source of money from which it is to be paid", except as provided in §§ 23, 24, and 25.

2. Art. 10 § 24, Okl. Const., authorizes the State to "contract debts to repel invasion, suppress insurrection or to defend the State in war."

3. Art. 10 § 25, Okl. Const., provides that no law authorizing a debt to be contracted shall take effect until the proposed obligation shall "have been *submitted to the people* and have received a majority of all the *votes* cast for and against it at such election." (Emphasis supplied)

as a "debt". Rather, it is about the State's constitutional authority to *accept—sans* an antecedent approval by a vote of the people—the proceeds of a loan that will not pass muster as a "self-liquidating" project's obligation. while today's pronouncement gives a green light to the proposed bonded indebtedness, I would declare that the transaction is fraught with a fatal constitutional infirmity.

## I.

## THE CONSTITUTION OF THE STATE OF OKLAHOMA COMMANDS THAT THE STATE SHALL NOT *BORROW* WITHOUT AN ANTECEDENT VOTE OF THE PEOPLE.

¶2 The Legislature has authority over the fiscal affairs of the State to the extent its power is exercised within the bounds set by fundamental law. The Constitution of the State of Oklahoma prohibits the State (its agencies and institutions) from *borrowing* or *contracting debts*[1] without a vote of the people, regardless of whether the duty to repay constitutes merely a moral or a legally enforceable obligation.

¶3 The State *cannot contract debts,* other than those necessary to repel invasion[2], without a vote of the people.[3] To contract a debt does not mean necessarily to create (against the State) a legally enforceable obligation. The fundamental law's concern is not with legally enforceable debts *stricto sensu.* In the constitutional sense, "to contract a debt" means simply to make an agreement for borrowing money.[4]

---

4. A contract is defined as an agreement to do or not to do a certain thing. 15 O.S.1991 §§ 1–2. Neither the presence of personal liability nor of a legally enforceable obligation is included as a *sine qua non* of this definition. In explaining the State's authority to contract debts, the court in *State ex. rel. Troy v. Yelle,* 36 Wash.2d 192, 217 P.2d 337 (1950), relied on *In re Application of State to Issue Bonds to Fund Indebtedness,* 33 Okla. 797, 127 P. 1065 (1912). *Troy* viewed a debt, in its constitutional sense, as "borrowed money." Just as it was explained in *Troy,* so also here, *the constitutional provision which limits the State's power to contract debts is to be treated as a prohibition against entering into an agreement to borrow money.*

## II.

## THE PROPOSED OBLIGATION MAY NOT BE HELD TO BE SELF–LIQUIDATING BECAUSE THE BONDS ARE TO BE RETIRED SOLELY FROM LEGISLATIVE APPROPRIATIONS OF STATE REVENUE.

¶4 This court has approved bonds that provide funds—*sans* an antecedent vote—for acquisition or construction of *self-liquidating projects*. That kind of obligation, the court held, does not create a debt because the bonds so issued are to be retired *solely* from revenues derived from the project itself See *Application of Bd. of Regents of Univ. of Okla.*, 195 Okl. 641, 161 P.2d 447 (1945); *Application of Bd. of Regents for Okla. Agric. & Mechanical Colleges*, 196 Okl. 622, 167 P.2d 883; *Baker v. Carter*, 165 Okl. 116, 25 P.2d 747 (dormitory bonds to be retired from rents and fees paid by student users); *Application of Okla. Turnpike Auth.*, 203 Okl. 335, 221 P.2d 795 (toll road bonds to be retired from tolls and fees paid by motorist users); *Application of Okla. Capitol Improvement Auth.*, 1960 OK 207, 355 P.2d 1028 (office building bonds to be retired from rents paid by office renters); *Application of Okla. Capitol Improvement Auth.*, 1966 OK 6, 410 P.2d 46 (building bonds to be retired from rents paid by space lessees).

¶5 In order for there to be a self-liquidating obligation, four basic criteria must be met. First, *all proceeds* from the sale of bonds must go toward a defined project. *Second,* the project must generate funds dedicated solely toward retirement of the bonded indebtedness. *Third,* the funds must be created by the terms of the obligation, and not from preexisting revenue. *Finally,* the stream generated by project funds must be placed beyond legislative control and dedicated to the retirement of bonds.[5]

¶6 None of the money to be realized through the sale of the bonds in contest here would be used to acquire or constrict property that is capable of generating funds for retirement of the bonds. The loan to be incurred is not for a true self-liquidating project. The bonds in suit are to be retired *solely* from *legislative appropriations* which are to be made from available *revenues of the State.*[6] Unlike toll roads, office buildings, and dormitories, highways dedicated to free public use can neither be leased nor rented unless originally built by, or otherwise placed tinder the charge of, the Oklahoma Turnpike Authority.

¶7 The bond obligation proposed here for the court's approval closely resembles the transaction considered in *Application of Okla. Educ. Television Auth.*, 1954 OK 219, 272 P.2d 1027. There, the bonds tendered were to fund the construction and operation of educational television facilities. They were to be retired with the use of legislative appropriations made from revenue accruing to the Public Building Fund.[7] The proposed transaction was held violative of Art. 10 § 23, Okl. Const., because it created a debt against the Public Building Fund of Oklahoma.[8]

¶8 Neither in *Application of Okla. Educ. Television Auth.* nor in the case at bar did the people vote on the proposed transaction. In both cases (1) the bonds to be approved are to be repaid solely from funds accruing to existing permanent funds of the State, and (2) no funds would be derived from the project itself.

¶9 The revenue funds to be used for repayment of the obligation proposed here are already in existence. In a *true* self-liquidating scenario, the fund source and the stream feeding money for repayment would not have been in existence at all but for the project-generated revenue.

5. *See Application of Okla. Capitol Improvement Auth.*, 1960 OK 207, 355 P.2d 1028, 1031; *Application of Okla. Educ. Television Auth.*, 1954 OK 219, 272 P.2d 1027, 1031.

6. See the provisions of 73 O.S. Supp.1997 § 168(E), (H), & (G) (referring to payment from the State highway construction and maintenance fund and from the State transportation fund).

7. *Application of Okla. Educ. Television Auth.*, 1954 OK 219, 272 P.2d 1027, 1028.

8. *Application of Okla. Educ. Television Auth.*, 1954 OK 219, 272 P.2d 1027, 1035.

¶ 10  The undeniable fact in the scheme used here for repayment is that there is total reliance on legislative appropriations. The project cannot generate any tangible revenue of its own. There is no possibility of repayment without dependence on annual legislative appropriations. This alone prevents the proposed transaction from qualifying as a "self-liquidating" project's obligation.

¶ 11  In short, the project itself will not generate revenue that would be sufficient to repay the bonds to be issued. For the obligation's repayment there is nothing more than reliance on legislative appropriations to be made from existing streams of State revenue. Nothing has been specifically committed toward repayment of the obligation to be incurred. The revenue stream designed for this case differs markedly from the criteria critical to the birth of a self-liquidating obligation. The latter model must create a purely circular fund flow—from loan proceeds to construction or acquisition and from project-generated revenue to the obligation's repayment—with absolutely no need for legislative intervention or for infusion of funds from *dehors* the project.[9]

## SUMMARY

¶ 12  The proposed transaction is more than a "modern method of financing." By the provisions of 73 O.S. Supp.1997 § 168.6, the State has indeed been authorized to "contract debt" without an antecedent vote by the people. The commands of Art. 10, §§ 23, 24, and 25, Okl. Const., which prohibit the State from borrowing money for repayment—*sans* an approval of the electorate—are clearly offended.

¶ 13  The Constitution recognizes but two methods for the State to borrow money: (1) where there has been an antecedent vote of approval by the electorate or (2) where the transaction creates a "self-liquidating" obligation. Neither of these has been employed for this bond issue. I hence dissent from the court's mischaracterization of the transaction in contest as a constitutionally authorized loan of money.

APPENDIX
*REVENUE STREAM*
*TYPICAL SELF-LIQUIDATING OBLIGATION*

9.  See attached Appendix.

PROPOSED TRANSACTION

To be used for repayment are available sources other than those generated by the project itself; the quantum of legislative appropriations is uncertain; there is nothing in the authorizing statute that commits some definite percentage of total revenue to the repayment of the bonds. 73 O.S. Supp.1997 § 168.6(E), (G) & (H).

ALMA WILSON, J., with whom LAVENDER, OPALA, and WATT, JJ., join, dissenting:

¶ 1 Today's judicial confiscation of art. 10, § § 23 and 25 annuls the right of the people to approve or disapprove multi-year deficit financing of an essential governmental function. For the first time, this Court gives its imprimatur to deficit spending by our legislative and executive officers. I cannot participate in the demise of our conservative fiscal management that is the hallmark of the Oklahoma Constitution. Since statehood, we have strictly adhered to the constitutional dictate that the people's resources be managed on a pay-as-you-go basis, leaving to the people their constitutionally preserved right to control the costs of borrowing and deficit spending. The Legislature and the Executive Branch should reconsider the evils of today's course of state expenditure.

¶ 2 The Oklahoma Capitol Improvement Authority (OCIA), a state agency comprised of the Governor, Lieutenant Governor, State Treasurer, and five appointed executive department heads, filed its application for approval of a proposal to borrow approximately $325 million dollars through a ten-year bond issue. The net proceeds, in the amount of $300 million dollars, are to be utilized to partially fund the statewide highway system improvement projects listed in the Legislature's five-year plan.[1] The paperwork submitted by the OCIA to this Court would create an obligation on the part of OCIA to repay the borrowed money. In the proposed bond form, the OCIA promises to repay the borrowed money to the bondholders at maturity, in ten years, and to pay interest on the principal on a semiannual basis on the first

1. 69 O.S.Supp.1997, § 2002 lists more than 100 improvement projects and 6 construction projects to be carried out in the eight highway

districts throughout the state over the next five years.

day of May and November of each year commencing May 1, 1998. The funds pledged to the payment of the principal and interest on the bonds, in the bond form, are payments to be made to OCIA by the Oklahoma Department of Transportation (ODOT). The payments from ODOT to OCIA are subject to annual appropriation to ODOT. Incorporated as part of the OCIA resolution to issue the bonds is the agreement between OCIA and ODOT whereby ODOT agrees to lease highway improvement projects from OCIA for monthly payments as may be appropriated by the Legislature for that purpose.[2]

¶ 3 OCIA urges that its obligation to repay the borrowed money is not a constitutional debt because: 1) ODOT's payments under the agreement are contingent upon annual appropriations; 2) future legislative bodies are not legally obligated to make the appropriations, even though they may be morally obligated; and 3) ODOT's payments are the only funds pledged to retire the bonds. In approving these so-called "appropriation-risk" bonds as not a debt, in the constitutional sense, the majority opinion, first, excludes the state highway system from the people's reserved legislative powers, and then, implicitly adopts the "expanded special fund" exception which this Court expressly rejected more than sixty years ago.

¶ 4 First, the majority opinion seriously confines the legislative powers reserved to the people to legislative subject areas not specifically mentioned in the Constitution. Citing the art. 5, § 36, art. 16, § 1, and art. 21, § 1, the majority opinion concludes that the Legislature, and not the people, have the power to determine policy for the state highway system. Never before has this Court read the constitutional provisions imposing specific duties on the Legislature to provide for public schools, public welfare, public roads, and the myriad of other subjects, as limitations on the people's constitutionally reserved legislative powers.

¶ 5 As early as 1924, this Court recognized the importance of the state's highway system to the people: "Aside from the building of institutions for education and religious training, probably no civic improvement is of greater necessity to our people than the construction of an adequate system of public highways."[3] And in 1937, this Court recognized the people's reserved power to determine whether a debt should be incurred through the issuance of bonds for highway improvement.[4] Today, however, the majority opinion removes the public highway system from the power of the people.

¶ 6 Second, the majority opinion again departs from established law and adopts the "expanded special fund" exception to our constitutional debt limitation provisions. The state debt limitations are set out in art. 10, §§ 23,[5]

---

2. The agreement between OCIA and ODOT is for the lease of the highway projects listed in 69 O.S.Supp.1997, § 2002, which authorizes ODOT "to construct, improve, maintain, and repair all or any of the following highway and bridge projects to the greatest extent possible with the allocation of funds provided." Projects, as defined by the Legislature are undertakings. 69 O.S.1991, § 231: "**Project**—An undertaking by the State Highway Commission, governing body or other governmental instrumentality for highway construction ... or other work or activity to carry out the provisions of the federal law for the administration of federal aid for highways." The agreement, apparently, is a promise by ODOT to perform the undertakings authorized in § 2002, and to make monthly payments to OCIA for the use of the bond proceeds. The majority opinion implies that this is a "profit-producing" agreement and concludes that it is a lease of tangible property. At best, the lease is a subterfuge to bring the transaction within the established exceptions to the constitutional debt limitation provisions.

3. *Edwards v. Childers*, 1924 OK ——, 102 Okla. 158, 228 P. 472, 477.

4. *Boswell v. State*, 1937 OK ——, 181 Okla. 435, 74 P.2d 940, 945.

5. Art. 10, § 23, reads in pertinent part:
   The state shall never create or authorize the creation of any debt or obligation, or fund or pay any deficit, against the state, or any department, institution or agency thereof, regardless of its form or the source of money from which it is to be paid, except as may be provided in this section and in Sections 24 and 25 of Article X of the Constitution of the State of Oklahoma ...
   5.... Any department, institution or agency of the state operating on revenues of derived from any law or laws which allocate the revenue thereof to such department, institution or agency shall not incur obligations in excess of the unencumbered balance of cash on hand. The application herein does not assert that the $325 million dollars which OCIA proposes to

24,[6] and 25.[7] Section 23 prohibits the state from creating or authorizing the creation of a debt or paying a deficit, regardless of the form or source of the payment, except as provided in the annual budget balancing provisions of § 23 and the provisions of §§ 24 and 25. Section 25 prohibits state officials from contracting multi-year debts, unless the debt is authorized by law. It also prohibits a law authorizing the contracting of multi-year debts from becoming effective[8] until it has been approved by a majority vote of the electorate.[9]

¶ 7 The Legislature has observed the prohibitions in art. 10, § 25, whether authorizing state officials to contract debts for ordinary governmental expenses[10] or for economic development through creative financing.[11] Legislative intent in not referring

borrow by issuing bonds is within the current fiscal year appropriations, as required by the budget balancing provisions in this section.

6. Okla. Const., art. 10, § 24 allows debts to be incurred in case of invasion, insurrection, or war, and is not applicable herein.

7. Art. 10, § 25 reads:
   · Except the debts specified in sections twenty-three and twenty-four of this article, **no debts shall be hereafter contracted by or on behalf of this State, unless such debt shall be authorized by law** for some work or object, to be distinctly specified therein; and such law shall impose and provide for the collection of a direct annual tax to pay, and sufficient to pay, the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty-five years from the time of the contracting thereof. **No such law shall take effect until it shall, at a general election, have been submitted to the people and have received a majority of all the votes cast for and against it at such election.** On the final passage of such bill in either House of the Legislature, the question shall be taken by yeas and nays, to be duly entered on the journals thereof, and shall be: "Shall this bill pass, and ought the same to receive the sanction of the people?"
   (Emphasis added.)

8. The words "take effect" "become effective" are utilized in several constitutional provisions to delineate when a legislative measure has the force of law. Okla. Const., art. 5, § 58, providing that an act of the Legislature shall not "take effect until ninety days after adjournment of the session at which it was passed," with exceptions for initiative and referendum enactments, emergency measures, and general appropriations; art. 5, § 3, providing that any measure referred to the people by initiative or referendum "shall take effect and be in force when it shall have been approved by a majority of the votes cast thereon and not otherwise"; and, art. 10, § 33 providing that a "revenue bill originating in the House of Representatives shall not become effective until it has been referred to the people of the state at the next general election held throughout the state and shall become effective and be in force when it has been approved by a majority of the votes cast. . . ."

The words "No such law shall take effect" in art. 10, § 25 is a limitation on the Legislature clearly expressed in the state constitution. *Jackson v. Freeman*, 1995 OK ——, 905 P.2d 217.

9. OCIA contends the borrowing is not within the prohibition of art. 10, § 25, therefore, it need not be submitted to the electorate.

10. 1992 Okla. Sess. Laws, H.J.R. No. 1076, authorizing a $350 million indebtedness for capital improvement, was referred to the electorate pursuant to art. 10, § 25, as a proposed constitutional amendment. Okla. Cons., art. 10, § 43, State Question No. 649, Legislative Referendum No. 293, adopted at the election held on November 3, 1992; together with a proposed statutory enactment, the Oklahoma Charity Games Act, 3A O.S.Supp.1997, enacted by 1992 Okla. Sess. Laws, ch. 328 and approved at the election on November 3, 1992.

11. 1987 Okla. Sess. Laws, H.J.R. No. 1028, authorizing $100 million general obligation bonds for economic development credit enhancement reserve fund to be issued by the Oklahoma Development Finance Authority and providing that the Legislature would make sufficient appropriations to retire the bonds. Okla. Const., art. 10, § 42, State Question No. 610, Legislative Referendum No. 267, adopted at election held on September 20, 1988.
   In the Oklahoma Futures measure, 1987 Okla. Sess. Laws, ch. 222, §§ 72 through 90, include legislative authorization for and terms and conditions of the $100 million indebtedness in art. 10, § 42, the proceeds of which are directed to the credit enhancement reserve fund, an integral part of the legislative policy to promote a public/private partnership and the state's strategic economic development efforts. In the following §§ 91 through 101, the Legislature declared that bonds were essential to the economic well-being of the state and established a bond oversight system to protect the public welfare. Nothing in the Oklahoma Futures economic development measure indicates that bond oversight is necessitated by extant decisional law. Notwithstanding, the majority opinion determines that bond oversight was established because this Court approved multi-year financing in *U C. Leasing, Inc. v. State Board of Public Affairs*, 1987 OK 43, 737 P.2d 1191, affirming a money-judgment for breach of a multi-year lease of law enforcement

73 O.S.Supp.1997, § 168.6 to a vote of the people can only be speculated. However, it is noted that § 1 68.6 was considered and enacted in the press of the final days of the legislative session [12] and the failure to refer § 168.6 to a vote of the people could have been an inadvertent omission in drafting. The people have not approved § 168.6.[13]

¶ 8 This Court has held that the constitutional debt limitations are expressed in plain and ordinary terms preserving to the people the right to know how much is available for appropriation [14] and the right to control the creation of debts in excess of the cash on hand.[15] In ordinary terms, a debt is a thing owed to another. Notwithstanding the clear expressions, this Court has defined "debt" within the constitutional debt limitations as an obligation for the payment of which resort may be had to state revenues.[16]

¶ 9 A public obligation is a constitutional debt where the obligation will be paid in a subsequent fiscal year and the payment will be derived, in whole or in part, directly or indirectly, from revenues raised through the taxing powers or from state owned property. Pursuant to this legal standard, we have recognized two exceptions to the constitutional debt limitations: 1) the restricted special fund or self-liquidating exception; and, 2) the

future installments for future services exception.

¶ 10 The special fund exception was adopted in *Baker v. Carter*, 1933 OK ——, 165 Okla. 116, 25 P.2d 747, wherein application was made for approval to issue and sell bonds to build dormitories at the Oklahoma Agricultural and Mechanical College at Stillwater. The Court found that the dormitory bonds would be retired out of a special fund consisting of rentals of dormitory rooms; there would be no fixed liability of the state, nor direct obligation on behalf of the state; and, there was no showing of a strong reason for believing any contingency, immediate or remote, would ever arise whereby the debt would fall on the state. The Court concluded there is no constitutional or statutory inhibition against the issuance of dormitory bonds payable out of a special fund inasmuch as the rentals would belong to the college without an appropriation by the legislature and only the rentals were placed in the sinking fund pledged to payment of bonds and no state property would be pledged to pay the rentals. *Baker v. Carter* adopted the special fund exception: the constitutional debt limitation is not violated by an obligation which is payable out of a special fund, if the state is not liable to pay the same out of its general revenues should the special fund prove to be

switching equipment for which the Legislature had made annual appropriations.

**12.** 73 O.S.Supp.1997, § 168.6, 1997 Okla. Sess. Laws, ch. 329, § 7, is the last of seven substantive sections of House Bill No. 1629. On May 29, 1997, the first Conference Committee Substitute for H.B. 1629, which contained two substantive sections providing for an appropriation from the Constitutional Reserve Fund, was rejected and returned to conference. House Journal, p. 1318. Subsequently on May 29, 1997, the second Conference Committee Substitute (the version of the measure enacted as ch. 329 of the 1997 session laws) was adopted by the House. House Journal, p. 1343. On May 30, 1997, the second Conference Committee Substitute was read and adopted by the Senate, Senate Journal, p. 1047, and approved by the Governor, House Journal, p. 1366.

**13.** 73 O.S.Supp.1997, § 168.6 authorizes the OCIA to issue "bonds or other negotiable instruments or evidences of indebtedness" to fund construction and improvement of the highway system and sets forth the terms and conditions of the bonds. Specifically, subsections (A) and (P)

authorize the OCIA to borrow and expend money on specified highway improvement projects; subsections (D) through (H) provide for payment of the borrowed money out of public revenues appropriated for that purpose; and, subsection (L) provides that the borrowed money shall be repaid no later than ten years from the first maturity date (some ten or more years in the future).

**14.** Appropriation requirements permit the people to control the sovereign in disbursements and serve as a legislative limit on powers of executive department and discretion of executive officers. *Edwards v. Childers*, 1924 OK ——, 102 Okla. 158, 228 P. 472, 476; and *Smith v. State Board of Equalization*, 1981 OK ——, 630 P.2d 1264.

**15.** *Boswell v. State*, 1937 OK ——, 181 Okla. 435, 74 P.2d 940.

**16.** *Graham v. Childers*, 1925 OK ——, 114 Okla. 38, 241 P. 178; *State ex rel. Kerr v. Grand River Dam Authority*, 1945 OK ——, 195 Okla. 8, 154 P.2d 946.

insufficient and the transaction by which the indebtedness is incurred cannot in any event deplete the resources of the state.

¶ 11 The *Baker v. Carter* special fund doctrine was "restricted" in *Boswell v. State,* 1937 OK ——, 181 Okla. 435, 74 P.2d 940. In *Boswell,* the State Highway Commission sought approval of a bond issue authorized by statute. Motor fuel taxes were pledged to pay the obligation, but as herein, the bond provided that it was not a debt of the state. *Boswell* observed that whether the bond would be a state debt is a judicial question and not legislative or executive question; that the people reserved to themselves control over creation of debt; that the money raised by issuance of the bonds would be used for maintenance and construction of highways, ownership which is in the state by virtue of the sovereignty and no other legal entity can claim ownership; that whether one or another part of the state revenue is drawn upon is immaterial, so long as the revenue could be available for any public purpose which the Legislature may designate; and, that the special fund created by imposition of motor fuel taxes is not a "special fund" within the meaning of the special fund doctrine. *Boswell* explained that the special fund doctrine is a test to determine if any part of the special fund is raised under the state's taxing power—if so, then the "restricted special fund doctrine" does not come into play, and, if not, then the obligations are self-liquidat-

ing and the "restricted special fund doctrine" applies.

¶ 12 *Boswell* further explained that the "expanded special fund doctrine" applies to obligations that provide for the extension or improvement of state property, which obligations are payable out of the future net income of the property as improved. *Boswell* expressly rejected the "expanded special fund doctrine." *Boswell* disapproved the proposed bonds because the highway improvement project was in no sense self-liquidating. That is, the special fund was created from specific taxes which constitute a part of the state's general revenue and could otherwise be devoted by the Legislature to any legitimate public use, and the existing roads would be used by those purchasing gasoline the same as any new construction. *Boswell* cautioned that confusion between the "special fund doctrine" and special funds, such as the highway maintenance and construction fund in the State Treasury, could lead to unwarranted extension of the "restricted special fund" exception to the constitutional debt limitation provisions.

¶ 13 The "restricted special fund doctrine" established in *Boswell* has remained the law, until today. If a multi-year obligation for a construction project is to be paid from a special fund, the moneys of which are generated solely from the project and not from any state revenues that could be distributed to another public function, then the bond issue and the project are self-liquidating.[17] The "restricted special fund" doctrine,

---

**17.** *Sheldon v. Grand River Dam Authority,* 1938 OK ——, 182 Okla. 24, 76 P.2d 355, concluding that the special fund doctrine adopted in *Baker v. Carter* and restricted in *Boswell v. State* may be invoked in a restricted sense as an exception to the debt limitation provisions where the project is purely self-liquidating and there is no pledge, direct, indirect or contingent, of the taxing revenue of state. *State ex rel. Kerr v. Grand River Dam Authority,* 1945 OK ——, 195 Okla. 8, 154 P.2d 946, recognizing that the inhibition in 1941 amendment to art. 10, § 23 applies solely to debt of which resort might properly be had to the taxing power of the state and not to a self-liquidating governmental agency such as the Grand River Dam Authority, inasmuch as the evil corrected by the 1941 amendment was the progressively mounting public indebtedness and undeniable and notorious fact that same was due to practice of incurring indebtedness through appropriations that exceeded probable revenues. *Application of Board of Regents of University of*

*Oklahoma,* 1945 OK ——, 195 Okla. 641, 161 P.2d 447, approving dormitory bonds per authority of *State ex rel. Kerr v. Grand River Dam Authority,* concluded that the budget balancing amendment applies solely to such debt of which resort might properly be had to the taxing power of the state. *Application of Oklahoma Planning and Resources Board,* 1949 OK ——, 201 Okla. 178, 203 P.2d 415, upholding bond issue for lodge and other improvements at Lake Murray State Park to be retired solely from lease payments and admission fees dedicated to payment of the bonds, which indebtedness is not, and cannot, become a debt of the state payable out of taxes levied by the state. *Application of Oklahoma Turnpike Authority,* 1950 OK ——, 203 Okla. 335, 221 P.2d 795, recognizing that art. 10, §§ 23 and 25 apply only to debts or obligations or deficits for which resort might be properly had to the taxing power of the state and upholding Turnpike Authority bonds payable solely from

however, was further restricted in *Application of Oklahoma Educational Television Authority,* 1954 OK ——, 272 P.2d 1027, holding that the language in the 1941 amendment to art. 10, § 23—without regard to source of money to be paid—means all public revenue whether derived from the taxing power or from other sources, such as land rentals. The bonds in that case were to be paid from the revenues accruing to Public Building Fund from lands granted to state by federal government, hence, the "restricted special fund" or self-liquidating doctrine was not applicable.

¶ 14 Because the proposed bonds, as contemplated by 73 O.S.Supp.1997, § 168.6, would be repaid by legislative appropriation, the restricted special fund or self-liquidating exception does not apply. However, finding that the improved highways will generate additional motor fuel taxes, the majority opinion implicitly adopts the "expanded special fund doctrine." The confusion of special funds of self-liquidating transactions and special funds for deposit of dedicated taxes by the majority is now insignificant, inasmuch as the debt limitation provisions are also of little or no significance with today's pronouncements.[18]

¶ 15 Under the guise of stare decisis, the majority opinion strikes down our constitutional debt limitations. It is obvious from the established legal principles set forth above, the majority opinion does not rest on stare decisis. Rather, stare decisis requires this Court to hold that 73 O.S.Supp.1997, § 168.6 falls squarely within the plain language of art. 10, § 25 that a "debt shall be authorized by law" and "No such law shall take effect until it shall, at a general election, have been submitted to the people and have received a majority of all the votes cast for and against it at such election." Until 73

O.S.Supp.1997, § 168.6 shall take effect and have the force of law, there is no effective authorization for the Oklahoma Capitol Improvement Authority to borrow money for improvement of the highway infrastructure through a bond issue as proposed herein.

¶ 16 True to my oath to uphold the Constitution of the State of Oklahoma, I will not participate in the demise of our clear constitutional requirement that the state maintain a balanced annual budget unless the people have given, at the ballot box, their prior approval of deficit spending. Today, this Court rules that a proposed ten-year highway bond issue would not create a state debt and therefore Oklahomans have no constitutional right to approve or disapprove of the bond indebtedness. The ruling is unmistakable—our state constitution no longer protects unsuspecting Oklahomans from the fiscal irresponsibility of state officials.

WATT, Justice, dissenting, with whom LAVENDER, OPALA and ALMA WILSON, JJ., join.

¶ 1 Through decades of constitutional jurisprudence, this Court has consistently guarded against the State's attempted use of long-term debt financing. In sanctioning the bond issue before us, the majority's decision flies in the face of our prior case law, runs afoul of the plain language of our Constitution, and sounds the death knell to Oklahoma's constitutional balanced budget provisions. I cannot accede to such a radical departure from our prior precedents, nor can I endorse the demise of this State's balanced budget. Contrary to the majority's assertions, these bonds will not be "self-liquidating" and will create a legally binding debt against the State without a vote of the people in violation of the Oklahoma Constitution. Furthermore, approval of the current bond

---

the revenues to be derived from the operation of the toll road.

**18.** Likewise the future installments for future services exception is now insignificant under the majority opinion. That exception has been applied to debts created for the construction of office buildings where the space is to be rented by state departments and the rental payments are pledged to retire the debt. We reasoned that the transaction did not obligate the state to pay ex-

cept as the services were received. *Application of Oklahoma Capitol Improvement Authority,* 1960 OK ——, 355 P.2d 1028; *Application of Oklahoma Capitol Improvement Authority,* 1966 OK ——, 410 P.2d 46; and *Halstead v. McHenry,* 1977 OK 131, 566 P.2d 134. As to multi-year equipment leases, see *U.C. Leasing, Inc. v. State Board of Public Affairs,* 1987 OK 43, 737 P.2d 1191.

issue is not mandated by *stare decisis*. Rather, as demonstrated below, *stare decisis* requires the opposite result.

¶ 2 In this original action, the Oklahoma Capitol Improvement Authority seeks this Court's approval for the issuance of $300,-000,000.00 in bonds to fund various construction and improvement projects, *including maintenance and repair*, on state highways and bridges. The bonds are to be retired over a ten year period through annual payments to the Authority from the Oklahoma Department of Transportation, which will receive the entirety of the repayment funds via annual appropriations from the Oklahoma Legislature.[1] Furthermore, the statute authorizing the bond issue, 73 O.S. Supp.1997 § 168.6, was not submitted to the citizens of Oklahoma for their consideration. The objections to the proposed bond issue filed by the various opponents urge that the proposed bonds would create state debt in violation of Article 10, §§ 23 and 25 of the Oklahoma Constitution. I agree.

¶ 3 Title 73 O.S.1991 § 160 confers upon this Court exclusive original jurisdiction to determine the validity of bond issues proposed by the Authority. In passing on such applications, we are to determine whether "the bonds have been properly authorized in accordance with [the Oklahoma Capitol Improvement Authority Act, 73 O.S.1991 § 151 et seq.] and the Constitution of Oklahoma, and [whether] when issued they will constitute valid obligations in accordance with their terms, ..." None of the opponents object to the manner in which the bonds were authorized and I detect no procedural infirmities. However, for the reasons set forth below, I would declare the proposed bond issue unconstitutional.

1. Title 73 O.S. Supp.1997 § 168.6(E) states in relevant part:

It is the intent of the Legislature to appropriate to the Oklahoma Department of Transportation State Transportation Fund sufficient monies to make payments to the Authority for purposes of retiring the debt created pursuant to this section.

2. The complete text of § 25 reads as follows:

Except the debts specified in sections twenty-three and twenty-four of this article, no debts shall be hereafter contracted by or on behalf of this State, unless such debt shall be

¶ 4 In construing the constitutionality of a statute, this Court is not authorized to consider the statute's propriety, desirability, wisdom or its practicality as a working proposition. Those questions are clearly and definitely established as functions of the Legislature. The function of this Court is limited to the determination of the validity of the statute. There is a presumption that the act is constitutional. The Legislature, unless prohibited by the Constitution, has the right to declare fiscal policy, and the question as to the wisdom of the policy is not within the scope of this Court's authority. We must, therefore, sustain statutes where possible and nullify them only when they are clearly unconstitutional. *Application of Okla. Capitol Improvement Auth.*, 1960 OK 207, 355 P.2d 1028, 1031.

¶ 5 Article 10, § 23 of the Oklahoma Constitution states in relevant part:

The state shall never create or authorize the creation of any debt or obligation, or fund or pay any deficit, against the state, or any department, institution or agency thereof, regardless of its form or the source of money from which it is to be paid, except as may be provided in this section and in Sections 24 and 25 of Article X of the Constitution of the State of Oklahoma....

Article 10, § 25 provides that no debt may be allowed against the state for some work or project unless the law authorizing the same "shall impose and provide for the collection of a direct annual tax to pay" for it, providing further that no such law shall take effect until approved by the people in a general election.[2] The issue in this proceeding is

authorized by law for some work or object, to be distinctly specified therein; and such law shall impose and provide for the collection of a direct annual tax to pay, the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty-five years from the time of the contracting thereof. No such law shall take effect until it shall, at a general election, have been submitted to the people and have received a majority of all votes cast for and against it at such election. On the final passage of such bill in either House of the Legislature, the question shall be taken by yeas and nays, to be duly

whether the State, through the enactment of 73 O.S. Supp.1997 § 168.6, has authorized the creation of a state "debt" in violation of Article 10, §§ 23 and 25.

¶ 6 In *Smith v. State Bd. of Equalization*, 1981 OK 57, 630 P.2d 1264, this Court described the purpose underlying § 23. We held:

> Article 10, § 23 was adopted by the people in 1941 to provide for budget balancing in this state. There is no room for construction or provision for further inquiry when the Constitution plainly speaks. A constitutional amendment should be construed in consideration of its purpose and be given practical interpretation to carry out the plainly manifested purpose of the people who adopted it. The fiscal responsibility shown by Oklahoma has become an enviable example for the nation. This policy of fiscal restraint and control can only be applauded in a time of monetary crisis. We do not find this constitutional requirement to be unduly burdensome nor to be a vain endeavor. The citizens of this state, as well as the Legislature, have a vested constitutional right to know how much money is available for appropriations to the General Revenue Fund and special funds which are supported by direct taxes, fees, and other revenue.

*Id.*, 1981 OK at ¶ 9, 630 P.2d at 1267 (footnote omitted).

¶ 7 Also instructive is the following language from *Boardman Co. v. Board of Comm'rs of Ellis County*, 1929 OK ——, 276 P. 474. Although the Court there was referring to § 26 of Article 10, which governs indebtedness of political subdivisions, the Court's rationale applies equally to § 23:

> We hazard the opinion that there can be found in our Constitution no provision couched in clearer or more comprehensive terms than this section. There is not even the possibility of ambiguity or misunderstanding as to what is meant.... What was uppermost in the minds of those who wrote this document, which is our fundamental law? The one purpose was to safeguard the citizens and taxpayers of the state against the ... [mis-] handling of public moneys. That provision is subject to no exigency, pays no heed to convenience, expediency, or emergency. It is safe, sane, unconditional, and, so far as human documents can be regarded, should be held sacred in its observance, interpretation, and enforcement. Once this clear protecting mandate is whittled away, reasoned around, or disregarded, for any cause, the chief guaranty of our orderly municipal progress, whether in state, county, city, town, township, or school district, is threatened.

*Id.*, 276 P. at 477.

¶ 8 With these directives in mind, I first address the majority's false assertion that *stare decisis* dictates approval of the proposed bonds. In *Application of Okla. Capitol Improvement Auth.*, 1960 OK 207, 355 P.2d 1028, this Court addressed the question of whether proposed bonds created a state debt in violation of §§ 23, 24 and 25.[3] We noted:

> This Court has approved statutes creating "self-liquidating" projects and the bonds issued to construct them as not creating a state debt, where only the revenue therefrom was usable for retirement of the bonds and no recourse was had to the revenue of the state for that purpose. *Application of Oklahoma Turnpike Authority*, 203 Okl. 335, 221 P.2d 795; *Application of Board of Regents for Oklahoma Agricultural & Mechanical Colleges*, 196 Okla. 622, 167 P.2d 883; *Baker v. Carter*, 165 Okl. 116, 25 P.2d 747.

*Application of Okla. Capitol Improvement Auth.*, 355 P.2d at 1031.

¶ 9 This Court approved the bonds at issue in 1960, which were to be issued to purchase state agency office space and which were "to be retired solely from the revenues from the office buildings." *Id.* at 1030. Regarding the cases cited above, in *Application of Okla. Turnpike Auth.*, 1950 OK ——, 221

---

entered on the journals thereof, and shall be: "Shall this bill pass, and ought the same to receive the sanction of the people?"

3. Article 10, § 24 applies only to debts incurred to "repel invasion, suppress insurrection or to defend the State in war; ..."

P.2d 795, the proposed bonds were to be issued for the purpose of building·a toll road and were to be retired "solely from the revenues to be derived from the operation of the toll road in question." 221 P.2d at 804. In both *Application of Bd. of Regents for Okla. Agric. & Mech. Colleges,* 1946 OK ——, 196 Okla. 622, 167 P.2d 883, and *Baker v. Carter,* 1933 OK ——, 165 Okla. 116, 25 P.2d 747, the proposed bond proceeds were to be used to construct dormitory buildings and the bonds were to be retired solely from "rents and fees to be received from the students using the dormitory...." 167 P.2d at 883, 25 P.2d at 753 (exact language used in both opinions). *See* also *Application of Okla. Capitol Improvement Auth.,* 1966 OK 6, 410 P.2d 46 (bonds to be used to construct state office buildings and to be retired by rents derived from such projects); *Application of Bd. of Regents of Univ. of Okla.,* 1945 OK ——, 195 Okla. 641, 161 P.2d 447 (dormitory bonds to be retired through rentals, fees and charges to students using dormitories).

¶ 10    The Authority argues that the present fact situation is analogous to those in the cases cited above. I disagree. The transparent, illusory nature of the proposed transaction in the present case constitutes a major distinction between the proposed bonds at issue here and those previously validated by this Court. The bonds proposed in this case are not self-liquidating; none of the money realized through issuance of the bonds will be used to purchase any property or assets that will generate funds with which the bonds may be retired. Highways dedicated to public use cannot be leased. They are constructed for the benefit of all citizens who travel upon them. The office buildings, dormitories and toll roads discussed in the cases above were capable of generating funds to retire the bonds issued to create them. Here, the bond proceeds will be used to construct or repair roads and bridges that are dedicated to the public use without any means of recoupment save annual legislative appropriations from the general revenues of the State. Patches of asphalt and concrete used to repair and maintain public roadways are simply incapable of generating the direct revenues required of a "self-liquidating" bond project.

Herein lies the constitutional infirmity of the bond issue proposed here.

¶ 11    This Court invalidated a similar proposed bond issue in *Boswell v. State,* 1937 OK ——, 181 Okla. 435, 74 P.2d 940. There, the State Highway Commission also sought to secure bond funds for constructing and repairing state highways and bridges. The statute that authorized the bond issue, which similarly was not presented to the people for consideration, pledged certain tax revenues to retire the bonds. We invalidated the bond issue on the grounds that it created state "debt" in violation· of the constitutional debt limits then found in Article 10, §§ 23–25.

¶ 12    Here, as in *Boswell,* the bond proceeds are earmarked for projects that will generate no revenues with which the bonds may be retired. Although specific funds have not been pledged toward the retirement of the bonds at issue in this case, the *Boswell* Court noted that the pledged tax revenues there were nonetheless "part of the general revenues of the state...." The appropriations to be used to pay for the bonds in the present case will also flow from this state's general revenues. *See* also *Excise Bd. of Carter County v. Chicago, R.I. & P. Ry. Co.,* 1931 OK ——, 152 Okla. 120, 3 P.2d 1037, and *Boardman Co. v. Board of Comm'rs of Ellis County,* 1929 OK ——, 136 Okla. 85, 276 P. 474 (In both cases this Court declared unconstitutional a county's attempt to incur indebtedness, beyond the current fiscal year and without a vote of the people, to repair/rebuild public bridges).

¶ 13    The majority also holds that its conclusion is consistent with and dictated by previous· opinions of this Court regarding leases. In *Application of Okla. Capitol Improvement Auth., supra,* 355 P.2d 1028, this Court distinguished between long-term obligations created by leases or contracts from long-term debts created by bonds. The distinction was made in the context of constitutional debt provisions. The Court noted that in a sense, any contract to pay money in the future would create a debt, but that courts generally exclude contracts payable in installments if the consideration is also to be provided in the future. *Id.,* 355 P.2d at 1032–33. A lease has been defined as "a

contract by which one owning ... property grants to another the right to possess, use and enjoy it for specified period of time in exchange for periodic payment of a stipulated price...." *Black's Law Dictionary,* 800 (5th ed.1979). The leases referred to in *U.C. Leasing, Inc. v. State ex rel. Bd. of Public Affairs,* 1987 OK 43, 737 P.2d 1191, *Indiana Nat'l Bank v. State Dept. of Human Serv.,* 1993 OK 101, 857 P.2d 53, and *Halstead v. McHendry,* 1977 OK 131, 566 P.2d 134, relied upon by the majority, typified classic installment leases. In each case, the governmental entity made annual payments for the annual use of certain property. The majority's assertion that "there is no constitutional difference between leasing equipment and leasing roads" misses the point. Public roadways and the repairs made thereto cannot be leased in the conventional sense of that word. The law governing leases is simply inapplicable to the bond proposal at issue here.

¶ 14 In each of the bond cases approved by this Court, bondholders could rely upon some tangible asset for repayment of their investment. In each case, the assets were capable of directly generating the funds that were to serve as the sole source of repayment of the bonds. Although factually and legally incongruous with bond issues, the lease cases discussed above also involved tangible assets that constituted a type of "collateral." In the event of default by the governmental entity, the lessors in those cases could rely upon the return of their "collateral" which served as the object of the lease. In this context, no tangible asset will be available here. The maintenance and repair projects under consideration here are incapable of producing direct revenues. · The bondholders are afforded no property upon which they may rely for repayment of their investments. In the event of default, the asphalt and concrete cannot be repossessed and sold to pay investors. *Stare decisis* requires rejection of these proposed bonds.

¶ 15 I also disagree with the majority's conclusion that the proposed bonds are self-liquidating because certain taxes and fees placed in the State Transportation Fund have been "earmarked" for the payment of highway bonds. As the majority correctly states, the Legislature has authorized the use of two different state funds for the payment of the bond debt. Subsection 168.6(E) refers to payments from the State Highway Construction and Maintenance Fund, 69 O.S.1991 § 1501, while subsections (G) & (H) refer to payments from the State Transportation Fund, 69 O.S.1991 § 1501.1. Both funds were in existence prior to the present bond issue and both consist of various tax and "other" revenues.

¶ 16 Initially, I find the majority's "self-liquidating" argument factually untenable. The Legislature has stated its intent in § 168.6(H) "to maintain the funding level of the State Transportation Fund as required in order for the Department of Transportation to fully pay any and all obligations incurred" by virtue of the proposed bond deal. Stated otherwise, the Legislature has vowed not to alter the current revenue make-up of the State Transportation Fund. However, as set forth in note 1, *supra.,* the Legislature has also stated its intent in § 168.6(E) to appropriate to the same fund "sufficient monies to make payments to the Authority for purposes of retiring the debt created pursuant to this section."

¶ 17 The majority's theory coupled with these two stated intentions beg the question: If the current funding level of the State Transportation Fund is sufficient to retire the proposed bond debt, why has the Legislature stated its intent to "appropriate" additional monies for that purpose? The answer to this question is that the current funding level of the State Transportation Fund is sufficient only to service the State's annual roadway needs. The proposed bond issue will create an extraordinary expense that will have to be funded by extraordinary appropriations. If the Fund contained sufficient monies to pay for the bonds, as the majority intimates in its "self-liquidating" argument, this bond issue would never have been proposed.

¶ 18 Second, I find the argument advanced by the majority legally flawed as having already been expressly rejected by this Court in *Application of Okla. Educ. Television Auth.,* 1954 OK ——, 272 P.2d 1027. There the Legislature passed a bill

authorizing the Educational Television Authority to issue revenue bonds for constructing and operating public television facilities. The bonds were to be paid with monies from the Oklahoma Public Building Fund. The enabling legislation in that case was strikingly similar to that in the case at bar: The Authority could sue and be sued and it was designated "an instrumentality of the state," the Act stated that the proposed bonds "shall never become obligations of the State of Oklahoma," and it provided "that neither the faith and credit, nor taxing power of the State, or any political subdivision thereof, is pledged to the payment of the principal of or the interest on such bonds." *Id.*, 272 P.2d at 1028. In both cases the proposed bonds were to be repaid solely from funds accruing to existing permanent funds of the State. In neither case was the bond issue submitted to a vote of the people.

¶ 19 In holding that the proposed bond issue violated Article 10, § 23, we distinguished the case from the previously sanctioned "self-liquidating" bond cases:

Those bond issues or debts [in the self-liquidating bond cases] were not created against existing permanent funds of the state, for regularly recurring use in the interest of the citizens of the state. The money realized by each of those bond issues itself created the construction or facility which in turn produced the income and funds against which the debt was a standing obligation, and the debt specifically could not be collected from any other source, nor paid with any other moneys. But for the creation or construction of the facilities in those cases, the funds against which those debts stood would never have existed. *But here we have the creation of a debt against a fund which has always existed as a valuable asset and fund of the state. This fund is not created by the facility here to be constructed, or operated, nor does this facility nor this Authority add anything at all to this permanent fund of the state.* If the bonds in this case were to be paid exclusively from revenue earned or received by the facility in the operation authorized by this Act, then the last cited authorities would be in point, and in keeping with such rule the transaction would not create a debt in violation of the quoted section of the Constitution.

*Id.* at 1031 (emphasis added).

¶ 20 Continuing, the Court held:

If [the Public Building Fund] and its proceeds did not exist and therefore was not available for use in behalf of the citizenship of the state, then the state could not have those things now purchased with that fund and its proceeds without using tax money of the state for such purpose. Therefore, while the Public Building Fund is not itself a tax revenue fund of the State, it serves purposes which if they were not served out of that fund, they must necessarily be served out of tax money, or the State must go without them. Therefore there is no fair analogy between this permanent fund of the State and the special revenue funds or self-liquidating debts involved in each of the foregoing . . . cases.

*Id.* at 1033.

¶ 21 As was true in the above case, there is no fair analogy between the self-liquidating bond cases and the case presently before us. The construction and maintenance projects proposed to be funded by the instant bond issue will produce no income that may be used to retire the debt. Moreover, the State Transportation Fund exists as a valuable asset and fund of the State. It was not created by the projects to be completed here, nor will the projects or the Authority add anything at all to this fund. The Fund "serves purposes which if they were not served out of that fund, they must necessarily be served out of tax money, or the State must go without them." The proposed bonds are in no sense self-liquidating.

¶ 22 Notwithstanding the above, the Authority contends the proposed bonds would not create state debt within the meaning of our Constitution because both § 168.6 and the bonds themselves contain language disavowing the creation of any such debt.[4] How-

4. Section 168.6(I) states:

The bonds or other obligations issued pursuant to this section shall not at any time be

ever, as this Court stated in *Boswell v. State*, 1937 OK ——, 181 Okla. 435, 74 P.2d 940, 943:

> [A recitation in a statute] that the notes "are not debts or general obligations of the State of Oklahoma," ... is in no respect conclusive of the matter. The question of whether the bill authorizes a debt of the state contrary to the constitutional provisions is a judicial and not a legislative question.

¶ 23 The language of both § 168.6 and the proposed bond issue makes clear that the Authority is "obligated" to pay the bondholders principal and interest on the bonds.[5] Article 10, § 23 refers to a debt or "obligation." For purposes of these proceedings, the terms are synonymous. See *The American Heritage Dictionary* 370 (Second College Ed.1985) ("debt" defined as "[a]n obligation or liability to pay or render something to someone else"). Moreover, § 168.6(E), n. 1 *supra*, specifically refers to the proposed bond deal as "the *debt* created pursuant to [§ 168.6]." (emphasis added). See also § 168.6(M), which discusses certain funds that may be used to pay "the annual *debt* service." (emphasis added).

¶ 24 Equally clear is that the Authority is a "department, institution or agency" of the State within the meaning of Article 10, § 23. Title 73 O.S. Supp.1997 § 152 specifically provides that the Authority is an "instrumentality of the state" and that the exercise of its

powers are "deemed and shall be held to be an essential governmental function of the state."

¶ 25 Finally, the Authority may be sued in the event of any default. Section 152 states that the Authority "may sue and be sued and plead and be impleaded." Section 18(h) of the *Resolution* provides:

> All such agreements and covenants entered into by the Authority shall be binding in all respects upon the Authority and its officials, agents and employees, and upon its successors, and all such agreements and covenants shall be enforceable by appropriate action or suit at law or in equity, which may be brought by any holder or holders of Bonds issued hereunder.

¶ 26 Taken together, the above facts lead me to conclude that the proposed bonds would create a debt or obligation against the Authority within the meaning of the Oklahoma Constitution. Therefore, the Legislature's authorization of such debt through the enactment of § 168.6 runs afoul of Article 10, §§ 23 and 25. I am cognizant that the Authority's liability to repay the bonds is limited to the appropriations specifically pledged for that purpose. 73 O.S. Supp.1997 § 168.6(F). However, that the liability may be limited does not alter the fact that a "debt" has been created against the Authority. *See U.C. Leasing, Inc. v. State ex rel.*

---

deemed to constitute a debt of the state or of any political subdivision thereof or a pledge of the faith and credit of the state or of any such political subdivision.

The proposed bonds would contain the following language:

> This Bond is not an indebtedness of the State of Oklahoma, nor shall it be deemed to be an obligation of the State of Oklahoma and neither the faith and credit nor the taxing power of the State of Oklahoma or any political subdivision thereof is pledged or may hereafter be pledged to the payment of the principal of or the interest on this Bond or the series of which it forms a part. This Bond is not a general obligation of the Authority nor a personal obligation of the members of the Oklahoma Capitol Improvement Authority, but is a limited obligation payable solely from the revenues specifically pledged to its payment.

*Oklahoma Capitol Improvement Authority September 23, 1997, Resolution,* § 8. Section 13 of

the *Resolution* contains virtually identical language.

5. The body of § 168.6 refers to the terms "obligated" or "obligations" some 24 different times, including the following excerpt from subsection (F):

> The bond indenture or other instrument pursuant to which the Oklahoma Capitol Improvement Authority *becomes obligated for the repayment of principal and interest* of the proceeds from the sale of obligations....

(emphasis added). *See also* § 18(g) of the *Resolution*, which states:

> The Authority covenants and agrees ... that it will promptly pay the principal of and interest on every Bond issued under the provisions of this Bond Resolution at the places, on the dates and in the manner provided herein and therein and in said Bonds. The Revenues are hereby pledged to the payment of the Bonds in the manner and to the extent herein specified.

*Bd. of Public Affairs,* 1987 OK 43, 737 P.2d 1191.[6]

¶ 27 At oral argument, the Authority asserted that the legislation at issue created merely a "moral" obligation on the part of the State to retire the bond debt. Their argument is based upon the previously quoted language of § 168.6 and the proposed bonds which declare that the bonds would never constitute debt of the State. Therefore, they argue, future legislatures would not be "legally" bound to appropriate monies to retire the debt. However, we need not here be concerned with whether the bond issue would create a moral, rather than legal, obligation against the State *itself,* because the issuance of such bonds would create a legally enforceable debt against an *instrumentality* of the State: The Oklahoma Capitol Improvement Authority. Counsel for the Authority admitted as much at oral argument. The creation of such debt against an instrumentality of the State is prohibited by the Oklahoma Constitution to the same extent as is the creation of such debt against the State itself.

¶ 28 As the majority noted, we were informed at oral argument that the proposed bonds will undoubtedly carry an "A+" rating. The reason for such rating is simple: Financiers and investors both know that the State of Oklahoma dare not default on any of its bonded indebtedness. Regardless of whether these proposed bonds are labeled "legal" or "moral," the economic reality is that the State's failure to repay bondholders in full would be devastating to Oklahoma's credit worthiness and cripple our ability to finance any project via future bond issues. Notwithstanding the language to the contrary, these bonds will indeed be backed by the full faith and credit of the State of Oklahoma.

¶ 29 The following language, enunciated by this Court over fifty years ago, applies with equal force and effect today:

[I]t is our solemn duty to determine the intent of the framers of the Constitution and of the people in adopting it with respect to the authority of the Legislature to incur debts which the people must pay. What we have said clearly demonstrates that the interpretation and construction sought to be placed upon these constitutional provisions by the [Authority] could not have been contemplated by the framers of that document, but that the people intended that the government should be operated on a cash, or pay-as-you-go, plan. It is significant to note that in the adoption of the Constitution the people reserved to themselves all power to determine whether or not debts should be incurred, excepting only those debts which might be incurred under the specific provisions of sections 23 and 24, article 10, of the Constitution, and also fixed upon themselves the responsibility for providing the revenue for the payment of such debts.

*Boswell,* supra, 74 P.2d at 945.

## CONCLUSION

¶ 30 The proposed bonds in this case are not self-liquidating and the statute authorizing their issuance, 73 O.S. Supp.1997 § 168.6, was not submitted to the people of Oklahoma for their consideration. The bonds will create debt against the Capitol Improvement Authority, an instrumentality of the State of Oklahoma, to be serviced solely through legislative appropriation from the general revenues of the State while circumventing the vote of the people called for in Article 10, § 25.

¶ 31 My oath of office requires me to support, obey and defend the Constitution of the State of Oklahoma, not repeal it. Accordingly, I would hold that the proposed bond issue is in violation of Article 10, §§ 23 and 25 of the Oklahoma Constitution.

---

6. In *U.C. Leasing,* we held:
Where a person or entity enters into a valid contract with the proper State officials and a valid appropriation has been made therefor, the State has consented to be sued and has waived it governmental immunity to the extent of its contractual obligations and such contractual obligation may be enforced against the State in an ordinary action at law.
*Id.,* 1997 OK 43 at § 19, 737 P.2d at 1195 (citation omitted).

ON PETITIONS FOR REHEARING

ALMA WILSON, J., with whom LAVENDER, OPALA, and WATT, JJ., join, dissenting to denial of rehearing:

¶ 1 Oklahoma's constitutional hallmark, our balanced-budget provisions, Okla. Const., art. 10, § 23, prohibits officials in all three branches of our state government from creating multi-year debts or authorizing deficit spending. Even when it is for the laudable purpose of highway improvement to encourage economic growth which I support, the State may not become indebted without voter approval. Okla. Const., art. 10, § 25.

¶ 2 The Class of 2000 should not inherit the cost of today's highway improvements unless that is the will of their parents and grandparents expressed at the ballot box. And, this Court should not join the Legislature in authorizing our highest Executive officials to engage in deficit spending without voter approval. Accordingly, rehearing should be granted so this Court may preserve the people's constitutional right to approve the proposed highway bond indebtedness herein.

WATT, Justice, with whom LAVENDER, OPALA and ALMA WILSON, JJ., join, dissenting:

¶ 1 The majority, through its original decision and by its vote today, sanctions the State's use of long-term debt financing without a vote of the people. The actions of the Legislature—and of the majority of this Court in ratifying them—do not simply whittle away at the clear protecting mandates of Article 10, §§ 23 and 25 of the Oklahoma Constitution, their actions gut the State's balanced budget amendments. Pursuant to the majority's rationale, the State will *never* create a legally binding obligation against itself if it issues bonds that contain certain "magic" language disavowing the creation of any such debt, regardless of the economic realities of the situation. No decision of this Court should rest upon such a fallacy.

¶ 2 What is particularly disturbing about the ratification of the current bond issue is that this is just the tip of the iceberg. Our citizenry would be well advised to prepare for future large-scale deficit financing of capital projects by State officials. Approximately two-thirds of the on-going one billion dollar road improvement legislation will be financed via these so-called "moral obligation" bonds. There is evidence in the record that suggests similar bonds for prison construction is next. The majority's decision will serve as no legal impediment for the issuance of "moral obligation" bonds for *any* capital improvement project. The taxpayers will eventually be called upon to foot the bill.